**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Fred LAMBERT, Defendant-Appellant.**

**No. 71-3453.**

United States Court of Appeals, Fifth Circuit.

Dec. 15, 1972.

Rehearing En Banc Granted April 17, 1973.

Thomas C. MacDonald, Jr., (court appointed), Tampa, Fla., for defendant-appellant.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Bernard H. Dempsey, Jr., Claude H. Tison, Jr., Asst. U. S. Attys., Tampa, Fla., for plaintiff-appellee.

Before JOHN R. BROWN, Chief Judge, TUTTLE and INGRAHAM, Circuit Judges.

TUTTLE, Circuit Judge:

This appeal involves the question of the applicability of 18 U.S.C. § 1001, which makes it a crime knowingly and willfully to make a false statement in any matter within the jurisdiction of any department or agency of the United States, to statements made to the Federal Bureau of Investigation (hereafter FBI). Appellant Lambert was convicted under this statute and sentenced to two years imprisonment. He appeals from his conviction, contending, among other things, that there was a fatal variance between what the indictment alleged and what was actually proved at trial, and that, in any event, he could not be convicted under this particular statute inasmuch as it has no applicability to statements made to the FBI. We reverse.

The case stems from Lambert's arrest by the Tampa police in the early morning hours of July 31, 1971. What transpired thereafter was the subject of considerable testimony at the trial, but because of the view we take of the case we find it unnecessary to trace in detail the factual circumstances of the arrest. Suffice it to say that Lambert apparently resisted arrest and, either fell or was knocked down; he sustained a broken nose, bruises on his face, and various cuts and abrasions claimed to have been at the hands of the arresting officers who admitted to having struck Lambert with what they called "slapjacks."

Several days later, upon the advice of a friend, Lambert went to the Tampa office of the FBI and filed a written statement in which he purported to recount the events surrounding his arrest, stating that he had been subjected to abusive treatment by the two plain clothes detectives who had arrested him. In his statement to the FBI, insofar as it is pertinent, he averred:

"When I came to 218 Beach Place I started to walk into the driveway, at which time the man who had been following me came up to me, showed a badge, and said he was a detective and I was under arrest. I said, 'You can't hold me. I haven't done anything.' The man then threw me to the pavement, and was joined by another man who said he was a detective. The second man was white, in his 40's, about 5'11", about 180 lbs., wearing sport shirt and pants. The second man put handcuffs on me and began to twist on the handcuffs so that I was in much pain.

"The two men picked me up and placed me in a car that was up the street a short way. I cannot describe the car. I was placed in the back seat. I tried to open the door to get out, at which time both men hit me with slapjacks on the head, face and arms. I was hit many times. I began to bleed from the nose and I was in much pain."

He stated that he was then taken to a hospital for treatment, following which he was "placed in a police wagon and was taken to the Tampa Police Department jail" where he was booked. He concluded his signed statement with the following comment:

"I feel that my civil rights have been violated because I was arrested for no reason by two men in plain clothes. The two men fractured and lacerated my nose, as well as injuring my eyes and arms. In view of my condition, I feel that I should have been permitted to stay in the hospital and not have been taken to the police jail to be booked. I feel that my rights were violated by the two men who identified themselves to me as detectives, names unknown to me."

Thereafter, the FBI conducted an investigation, which, it asserts, consumed some "thirty man hours", and concluded that Lambert's averment that he had

been deprived of his civil rights was untrue and that his statement was false in material respects. As a consequence an indictment was returned against Lambert charging a violation of 18 U.S.C. § 1001 which provides:

"Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

More specifically the indictment charged as follows:

". . . FRED LAMBERT knowingly and wilfully did make and cause to be made a false, fictitious and fraudulent representation as to material facts in a matter within the jurisdiction of the Department of Justice, Federal Bureau of Investigation, an agency of the United States, in that in a written statement signed by the defendant and witnessed by Special Agent John Edward Hegerty, Federal Bureau of Investigation, submitted to the Federal Bureau of Investigation, Fred Lambert stated and represented that he had been severely beaten and subjected to illegal and unnecessary punishment by two members of the Tampa Police Department, Tampa, Florida, in violation of his Civil Rights, where in truth and in fact, as he then knew, he had not been severely beaten and he had not been subjected to illegal and unnecessary punishment and his Civil Rights had not been violated by the two members of the Tampa Police Department. . . ."

It is readily apparent that the indictment did not contain the exact words used in Lambert's statement, and thus failed to charge that the precise statements made by Lambert were false. After the statement had been introduced in evidence and the case was concluded, Lambert accordingly made a motion for judgment of acquittal on the ground that there was a fatal variance between the indictment and the proof. The motion was denied and the jury returned a verdict finding Lambert guilty of the offense as charged.

Having reviewed the record, we must conclude that if the indictment had specifically pinpointed the statements that were charged to be false, there is little doubt that the jury would have had adequate evidence upon which to find that Lambert had in fact made false statements to the FBI. However, the indictment did not pinpoint the alleged false statements and this fact gives rise to Lambert's first point on appeal, i. e., that the trial court erred in not dismissing the prosecution on the ground that whereas the indictment charged Lambert with having falsely stated and represented that the Tampa police officers had "severely beaten" him and subjected him to "illegal and unnecessary punishment", the actual statement made by Lambert to the FBI, which was introduced in evidence and as to which there is no dispute, mentioned neither a severe beating nor illegal and unnecessary punishment.

The government contends, however, that Lambert's statements assuredly describe a "severe beating" and "illegal and unnecessary punishment." This may well be, but appellant contends that the argument is irrelevant, for one thing, because in a criminal prosecution the jury ought not be left to ponder such interpretative leaps, and for a second thing, and more importantly, because some of the events described in appellant's statement actually occurred. It is noted that appellant, in his statement, made six factual averments relating to physical contact.

They were:

1) "The man threw me to the pavement . . ."

2) "This second man put handcuffs on me . . ."

3) "[The second man] began to twist on the handcuffs . . ."

4) "Both men hit me with slapjacks on the head, face, and arms."

5) "I was hit many times."

6) "The two men fractured and lacerated my nose as well as injuring my eyes and arms."

Of these several statements it is undisputed that the arresting officers wrestled Lambert to the ground and put handcuffs on him (Numbers 1 and 2). It is further undisputed that each of the police officers struck Lambert at least once with a slapjack and that on one occasion the blow from a slapjack glanced off Lambert's leg and struck him alongside the head (Number 5 and part of Number 4). Nonetheless, the indictment, as phrased, channeled the jury into deciding, not whether some or all of Lambert's *specific* averments to the FBI were false (which is the appropriate standard for conviction under this particular statute), but whether the treatment which Lambert received at the hands of the police amounted to a "severe beating" or "illegal and unnecessary punishment." Of course, that is not what the prosecution was about. We think that in cases such as this, where the issue is whether false statements were made to a governmental agency, it is inappropriate for the prosecutor to put words into the accused's mouth and to try him, not for what he actually said, but for what the prosecuting attorney says he said.

■ However, we find it unnecessary to decide whether there was such a fatal variance between the indictment and proof as to require a dismissal of the indictment for we are of the view that this indictment must be dismissed for a more fundamental reason. It is our conclusion that 18 U.S.C.A. § 1001, which forms the basis for the conviction here at issue, is not applicable to such statements made by a private citizen to the FBI.

In recent years this issue has been the subject of considerable controversy, with cases on both sides of the issue. However, we are inclined to follow the views announced by the Court of Appeals for the Eighth Circuit which, in Friedman v. United States, 374 F.2d 363, 369 (CA 8, 1967), held on facts similar to the ones before us that Section 1001 has no application "where a statement is given to the FBI merely for the purpose of instigating an investigation into the possibility of a violation of the criminal law . . . ." The court's rationale was that such a statement is not a "matter within the jurisdiction" of the FBI, as that term is used in the statute, because the term "jurisdiction" means something more than the power to investigate; the FBI has no inherent power to grant the relief sought. The court noted that "[n]o one would deny the Government's right under the statute to protect itself from fraudulent claims and from those who are seeking the grant of governmental privileges under false assertions. When the false statement is made to the agency with the power to allow the privilege or grant the award, jurisdiction of the agency is established so as to warrant a prosecution under § 1001." But, inasmuch as the FBI has no power "to adjudicate rights, establish binding regulations, compel the action or finally dispose of the problem giving rise to the inquiry" it does not exercise "jurisdiction" over the matter sought to be investigated. Therefore, the court concluded, an indictment does not charge a violation of 18 U.S.C.A. § 1001 when it charges the giving of false information to the FBI relative to a violation of the criminal law.

We are not unmindful of the countervailing authority from the Second Circuit. In United States v. Adler, 380 F. 2d 917 (CA 2, 1967) that court explicitly rejected the Friedman rationale and held that the term "jurisdiction" should be given a broad and non-technical mean-

ing. Counsel for the government urges that this view of the statute was subsequently confirmed by the Supreme Court in Bryson v. United States, 396 U.S. 64, 70, 90 S.Ct. 355, 359, 24 L.Ed.2d 264 (1969) in which the court held, in a case involving the National Labor Relations Board, that "[b]ecause there is a valid legislative interest in protecting the integrity of official inquiries [citations omitted], we think the term 'jurisdiction' should not be given a narrow or technical meaning for purposes of § 1001." The court cited the Adler case for that proposition and relegated Friedman to a footnote in which it said: "We have no occasion in the present context either to approve or disapprove Friedman's holding." [1]

To this point we have considered at some length the niceties of statutory construction, but the underlying question here is whether this statute in all instances is to be read and applied literally. The Adler case implies that it should be, but such a view, in our opinion, is contrary to the weight of authority and, perhaps more important, is at odds with the purpose and intent of this piece of criminal legislation.

It is noted that we are dealing with a very broad statute. Were it to be applied in every situation consonant with its literal wording any individual who passed on to a governmental agency the most trivial bit of misinformation would be criminally liable for his statement. Indeed, not only would he be criminally liable, but he would be subject to severe punitive sanctions, more severe, in fact, than those attaching to perjury.[2]

Of course, it might be argued that a "trivial" falsehood would not fall within the purview of this statute. However, as to "false, fictitious, or fraudulent statements or representations" generally

(the provision under which Lambert was indicted) the statute on its face contains no requirement of materiality. Courts have had to read this requirement into it, thus construing it in a manner different than in accord with its literal language. Brethauer v. United States, 333 F.2d 302 (CA 8, 1964).

Moreover, this court and others have refused to apply the statute, *though literally it would apply*, to cases involving what has come to be known as the "exculpatory no." See Paternostro v. United States, 311 F.2d 298 (CA 5, 1962) and cases cited therein. In such instances it has been held that where an individual falsely denies the truth of questions submitted to him by government agents, such responses are not "statements" or "representations" within the meaning of Section 1001 and therefore are not subject to criminal prosecution under it. Of course, literally such an answer would be within the statute, for it contains no exception for the "exculpatory no."

The Paternostro principle was taken a step further by the Court of Appeals for the Ninth Circuit in United States v. Bedore, 455 F.2d 1109 (CA 9, 1972) which held that the giving of a false name to a special agent of the FBI was, like the exculpatory no, not a statement for purposes of Section 1001. The court said: "The statute was not intended to embrace oral, unsworn statements, *unrelated to any claim of the declarant to a privilege from the United States or to a claim against the United States*, given in response to inquiries initiated by a federal agency or department, except, perhaps, where such a statement will substantially impair the basic functions entrusted by law to that agency." 455 F.2d at 1111. (emphasis added).

---

1. This footnoted comment, of course, indicates that the *ratio decidendi* of Friedman was never at issue in the Bryson case. We reject the government's suggestion that Bryson should be read as an implicit, if not explicit, disavowal of the Friedman holding.

2. Section 1001 provides for a fine of $10,000, five years imprisonment, or both for the making of a false, *unsworn* statement. The analogous statute for *perjury* (18 U.S.C.A. § 1621) provides a maximum penalty of $2,000, five years imprisonment, or both.

■■ Of course, the foregoing cases, involving statements made *in response to* inquiries by a criminal investigatory agency, do not directly control the disposition of the case before us in which the individual *volunteered* his complaint to the FBI. However, they serve to illustrate the fact that the courts have been reluctant to apply this harsh and rigorous penal statute literally where to do so would not comport with what must have been Congress' purpose and intent in enacting the statute. Our view that this criminal provision does not apply to statements such as Lambert's made to the FBI we think is fully consonant with the legislative intent. However, inasmuch as the legislative history of this particular statute has been set forth in detail by the Supreme Court in United States v. Bramblett, 348 U.S. 503, 75 S.Ct. 504, 99 L. Ed. 594 (1955) and United States v. Gilliland, 312 U.S. 86, 61 S.Ct. 518, 85 L. Ed. 598 (1941) we do not here undertake to repeat it at length. We note only that the statute which, in various forms, has been on the books for more than 100 years was originally designed to protect governmental agencies from fraudulent *monetary* claims. The statute was amended in 1934 and again in 1948 (to its present form) in order to eliminate the restriction of its scope to situations involving pecuniary or property loss to the government. As to the alteration with which we are concerned in this case [3] the Supreme Court said:

> "The amendment eliminated the words 'cheating and swindling' and broadened the provision so as to leave no adequate basis for the limited construction which had previously ob-

tained. The statute was made to embrace false and fraudulent statements or representations where these were knowingly and willfully used in documents of affidavits 'in any matter within the jurisdiction of any department or agency of the United States.' In this, there was no restriction to cases involving pecuniary or property loss to the government. *The amendment indicated the congressional intent to protect the authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described.*" United States v. Gilliland, supra at 93, 61 S.Ct. at 522. (emphasis added)

In summary, then, it may fairly be said that running through this legislation is the congressional purpose not only to protect the government against false pecuniary claims, but, as well, to protect governmental agencies from perversion of their normal functioning.

Clearly Lambert's statement to the FBI did not comprehend a pecuniary claim against the government. The question then is whether his allegedly falsified report in any sense perverted the normal functioning of the FBI. We think not. Indeed when appellant went into the Tampa office of the FBI, he went to ask that agency to do what it normally does, that is, to investigate. *The normal function of the FBI was to ascertain whether Lambert's statements were true or false* and the mere fact that they were, upon investigation, found to be false does not mean, ipso facto, that they worked a perversion of the FBI's regular business.[4]

---

3. We limit our attention to the 1934 amendment which added the proscription against false or fraudulent statements. The 1948 amendment merely effected a housekeeping change which did not substantively alter the 1934 version insofar as it related to false statements. See United States v. Bramblett, supra.

4. Though we do not so decide, we note that in this context the FBI might not

be an "agency" for purposes of Section 1001. Section 6 of Title 18 U.S.C.A., which contains the definition of "agency" as that word is used in the criminal provisions of Title 18, provides: "The term 'agency' includes any department, independent establishment, commission, administration, authority, board or bureau of the United States or any corporation in which the United States has a proprietary interest, *unless the con-*

In reaching this decision we have been influenced to an extent by the important national policy of preserving an open line of communications between private citizens and law enforcement agencies. We do not wholly agree with the conclusion of the court in Adler that "individuals acting innocently and in good faith, will not be deterred from voluntarily giving information or making complaints to the FBI." 380 F.2d at 922.[5] Moreover, law enforcement efforts may frequently be enhanced by taking affirmative action based on statements on the periphery of truthfulness, or as it were, containing a part truth.

As the court in Friedman said:

"To construe this statute to embrace individuals who volunteer unsworn information to the police, even though the information is proved false, we fear would to a degree dry up a prime source of truthful information. When the specter of criminal prosecution hangs over the head of every citizen who reports suspected violations, individuals will naturally hesitate, or even refuse, to provide vital information. They will fear that should their information appear to be false to the police they may be called upon to defend themselves in a criminal prosecution." 374 F.2d at 369.

We are all familiar with the possibilities that arise when an individual makes a complaint concerning law enforcement officers (local or national). He is often met with a difficult or impossible burden of proof. If feelings run high, the ones complained against may feel strong enough of their position to seek an indictment under such a statute as this. Need we speculate on the chilling effect of such punitive possibilities on even the person who is honest and acting in good faith?

■ We conclude that 18 U.S.C.A. § 1001 has no application to the facts of this case. No crime having been charged, appellant is entitled to a judgment of acquittal. The judgment accordingly is reversed and the case is remanded to the district court with instructions to dismiss the indictment.

## ON COURT'S OWN MOTION

Before JOHN R. BROWN, Chief Judge, WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, INGRAHAM and RONEY, Circuit Judges.

### BY THE COURT:

A majority of the Judges in active service, on the Court's own motion, having determined to have this case reheard en banc,

It is ordered that this cause shall be reheard by the Court en banc on briefs without oral argument. The Clerk will specify a briefing schedule for the filing of supplemental briefs.

---

*text shows that such term was intended to be used in a more limited sense.*" (emphasis added) Since a primary function of the FBI is to investigate the truth or falsity of complaints made to it by private citizens, it would not be unreasonable to assume that a penal statute such as Section 1001, which is directly concerned with the truth or falsity of any given statement, could not have been intended to embrace the FBI.

5. We feel that even this source of information might well dry up if some of those persons who act innocently and in good faith are indicted for violation of this serious criminal provision because what they say subsequently turns out to be untrue. The case before us, we think, furnishes a good example. Although the jury found that Lambert had knowingly and willfully falsified his statement to the FBI, we simply cannot overlook the fact that Lambert indeed was thrown to the ground by the arresting officers and was later struck by them with slapjacks. Undoubtedly his statement greatly exaggerated the seriousness of this treatment, but we are unable to say that he might not himself have believed that he was thus abused. In the heat of the moment a peculiarly excitable individual might well view the incident in a far more serious light than objective analysis would support.