**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Fred LAMBERT, Defendant-Appellant.**

**No. 71–3453.**

United States Court of Appeals, Fifth Circuit.

Sept. 20, 1974.

944

Thomas C. MacDonald, Jr., Tampa, Fla. (Court-appointed), for defendant-appellant.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Bernard H. Dempsey, Jr., Claude H. Tison, Jr., Asst. U. S. Attys., Tampa, Fla., Henry E. Petersen, Asst. Atty. Gen., Crim. Div., Washington, D. C., for plaintiff-appellee.

Before BROWN, Chief Judge, TUTTLE, Senior Circuit Judge, and WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, INGRAHAM, RONEY and GEE, Circuit Judges.

GODBOLD, Circuit Judge:

Lambert, the appellant, was convicted under 18 U.S.C. § 1001[1] and sentenced to two years imprisonment for making a false statement to the Federal Bureau of Investigation. He had come to the FBI of his own volition to make a complaint. Following an interview he signed a written statement in which he claimed that two Tampa, Florida, police officers had physically mistreated him. Also, he stated his "feeling" that his civil rights had been violated because the two officers, in plain clothes, had arrested him for no reason. The statement was intended to, and did, trigger an FBI investigation into the incident. Subsequently appellant appeared before a federal grand jury which indicted him for perjury. For some reason not shown by the record, nothing came of the perjury charge, but appellant was indicted again under § 1001 and conviction followed.

A panel of this court reversed the conviction, United States v. Lambert, 470 F.2d 354 (CA5, 1972), adopting the reasoning of Friedman v. United States, 374 F.2d 363 (CA8, 1967), in which the Eighth Circuit held that a statement made to the FBI to touch off an investigation does not fall within the prohibition of § 1001, and rejecting that of the Second Circuit in United States v. Adler, 380 F.2d 917 (CA2, 1967), which was directly contra to *Friedman*. Rehearing was granted on the Court's own motion. We now vacate the panel opinion but reverse the decision of the District Court for the alternative reason, advanced by appellant in his brief and discussed but not relied upon by the panel, that on the particular facts of this case there was a fatal variance between the indictment and the proof.[2]

---

1. Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both. 18 U.S.C. § 1001 (1970).

2. There was evidence tending to prove that appellant, after being lawfully arrested, kicked, fought, bit, scratched, and forced his way out of the police car, and fell to the

## I.

■ Appellant argues for a narrowing construction of the § 1001 phrase "matter within the jurisdiction" of a federal agency. We are bound, however, to give that language a broad, nontechnical meaning. See Bryson v. United States, 396 U.S. 64, 90 S.Ct. 355, 24 L.Ed.2d 264 (1969); United States v. Bramblett, 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594 (1955). Receiving and acting on statements of one kind or another is central to the function of the FBI. Perversion of a governmental body's function is the hallmark of a § 1001 offense. United States v. Gilliland, 312 U.S. 86, 93, 61 S.Ct. 518, 522, 85 L.Ed. 598, 603–604 (1941). Statements such as that given by appellant and falsely pointing to possible criminal conduct that is within the power of the FBI to investigate carry a substantial potential for wasting the Bureau's time and thus perverting its central function. We, therefore, hold that such a statement is a "matter within [FBI] jurisdiction" under § 1001.²ᴬ

We do not overlook the interest, relied upon by the panel opinion, that an open line of communication should be preserved between private citizens and law enforcement agencies. Voluntary disclosure may be inhibited if the citizen who comes forward is exposed to the risk of criminal prosecution in the event that what he says turns out to be untrue. We have, however, no objective data defining the extent of this risk, and judges differ in their subjective estimates. In any event, the risk is tempered by the "knowingly and willfully" requirement of the statute. Also, the potential for overzealous application of § 1001 by law enforcement agencies poses a limited threat because investigators, to whom access to information is critically important, would not want to gain a reputation for routinely seeking to prosecute complainants and informants who give false information. If agency self interest is not a sufficient brake, the establishment of different policies for the governmental agencies affected is in the executive and legislative rather than the judicial domains.

■ In reaching our conclusion we intend no violence to Paternostro v. United States, 311 F.2d 298 (CA5, 1962). There we held, like several other courts before and since,³ that a generally negative and exculpatory response made by a subject of a criminal investigation in reply to questions directed to him by investigating officers is not a crime under § 1001. *Paternostro* construed the word "statement," not the phrase "in any matter within the jurisdiction" of a federal body. We note, too, that an exculpatory denial by a person under investigation may have less potential for misleading the Bureau and perverting its function than a discursive voluntary statement involving the suggestion that persons other than the maker of the statement are guilty of federal crimes.⁴

pavement. This case is not concerned with whether he resisted arrest or was a bad prisoner, except to the extent that his actions relate to the federal false statement charge.

**2A.** A statement given during the course of an investigation would seem facially to be as much a "matter within the jurisdiction" of the FBI as a statement triggering an investigation, if not more so. Such a statement, however, may collide with the "exculpatory no" cases and the disturbing proximity of the Fifth Amendment, see footnotes 3 and 4 *infra*, and accompanying text.

United States v. Ehrlichman, 379 F.Supp. 291 (D.D.C., 1974), concerned a statement given in the progress of a criminal investigation initiated by the FBI. The court held § 1001 not applicable. (The statement was given without oath or verbatim transcription.) Neither the panel opinion, this opinion, nor Judge Tuttle's opinion dissenting in part to this opinion, reaches the issue of § 1001 in the context of an FBI investigation in progress.

**3.** See, e. g., United States v. Bedore, 455 F. 2d 1109 (CA9, 1972); United States v. Stark, 131 F.Supp. 190 (D.Md.1955).

**4.** Undoubtedly the judicial gloss put on § 1001 by the "exculpatory no" decisions originates at least in part from latent distaste for an application of the statute that is uncomfortably close to the Fifth Amendment.

## II.

■ The foundation of the variance doctrine is the Fifth Amendment's command that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." If an indictment alleges particular facts as constituting an element of a charged crime, there is a variance if the trial judge admits evidence that makes out the element in a different manner. Thus in United States v. Stirone, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), in alleging the interstate commerce element of a Hobbs Act offense (obstructing interstate commerce by extortion) the grand jury stated in the indictment that the extorted owner of a concrete company imported raw materials from out of state. At trial the government presented not only evidence of importation of sand (a raw material) but also evidence that the company's finished product was used to build an in-state mill to manufacture steel articles for interstate sale. The trial judge instructed the jurors that if they believed the government had borne its burden of proof on either type of interstate movement, the interstate commerce element of the offense would be sufficiently made out. The Supreme Court found a variance,[5] holding that it "destroyed the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury." 361 U.S. at 217–218, 80 S.Ct. at 273, 4 L.Ed.2d at 257.

An essential element of a § 1001 offense is a statement, and the indictment in the present case alleged one in the following language:

Fred Lambert stated and represented that *he had been severely beaten and subjected to illegal and unnecessary punishment* by two members of the Tampa Police Department, Tampa, Florida, *in violation of his Civil Rights* . . . (emphasis added). The indictment identified the alleged falsification by stating that

in truth and in fact,· as [Lambert] then knew, *he had not been severely beaten and he had not been subjected to illegal and unnecessary punishment and his Civil Rights had not been violated* by the two members of the Tampa Police Department (emphasis added).

■ The government acknowledges that there was a variance between charge and proof. The statement given to the FBI and introduced at trial—more than 3½ closely spaced handwritten pages and containing about a thousand words—did not contain an utterance by Lambert that he had been "severely beaten" or that he had been "subjected to illegal and unnecessary punishment."[6] The statement used neither the term "severe beating" nor the term "illegal and unnecessary punishment." The closest that it came to the former was in reciting various instances of physical contact with the police officers. Appellant referred to being thrown to the pavement after telling the police "You can't hold me, I haven't done anything," and to being struck on the head, face, and arms with slapjacks when he tried to get out of the car, resulting in a broken nose, bleeding from the nose, and pain, and, at least inferentially, in some injury to eyes and arms.

■ Not every variance is fatal. Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). Once

---

5. "The grand jury which found this indictment was satisfied to charge that Stirone's conduct interfered with interstate importation of sand. But neither this nor any other court can know that the grand jury would have been willing to charge that Stirone's conduct would interfere with interstate exportation of steel from a mill later to be built with Rider's concrete. *And it cannot be said with certain-ty that with a new basis for conviction added, Stirone was convicted solely on the charge made in the indictment the grand jury returned.*"

United States v. Stirone, 361 U.S. 212, 217, 80 S.Ct. 270, 273, 4 L.Ed.2d 252, 257 (1960) (emphasis added).

6. The full text of the statement appears as Appendix A of this opinion.

the evidence is in it must appear, by retrospective comparison of *probata* with *allegata,* that the defendant was deprived of fair notice sufficient to enable him to prepare his defense.[7] The extent or range by which proof may vary from indictment before prejudice arises is much narrower, in a false statement case than in many other prosecutions. If the criminal charge concerns a physical event or occurrence the inquiry is single —did the defendant do the act? In the false statement case the inquiry is threefold: Did the defendant say what the indictment charges him with saying? If he did, does it depart from the truth? Was it material?[8] The starting point for everything is the statement. Once the defendant is informed what it is he is claimed to have said, then he can marshal his evidence tending to show that he did not make the utterance charged, or that it is true, or that it was not material. If the threshold information given is not correct, the defendant is hampered in defending on all three grounds, since the starting point for the latter two is the content of his alleged statement.

We do not hold that there is a fatal variance if the statement shown by the evidence is not *in haec verba* with the statement charged in the indictment. But in this instance the range was too wide. What occurred was not a mere substitution in the indictment of synonymous words in a brief utterance both clearly identified and with its parameters marked. Rather the phrases "severe beating" and "subjected to illegal and unnecessary punishment" were prosecutorial efforts to summarize and restate either the overall tenor of the entire statement signed by defendant or the gist of selected but unidentified portions extracted from it. In this context variance impinges very quickly upon the defendant's ability to mount a defense. Before trial, defense counsel—presumably having a copy of the statement (the government asserts it was furnished) and able to observe that it did not contain the utterances charged—moved to dismiss on the ground the indictment was too vague and indefinite. The motion was dismissed, and properly so. The trouble with the indictment was not vagueness and generality in what it said but its use of facially specific terms which, as it developed at trial, were not intended to be that at all, but to be generalized recharacterizations of what the draftsman considered to be the substance of all or of parts of what it would try to prove the defendant had said. In this situation a defendant is left to guess what part or parts of the statement placed in evidence the government will rely upon, or whether it will rely on overall tenor. The prosecution is free at trial, in offering evidence and arguing to the jury, to pick and choose previously unspecified bits and pieces of the statement that it considers arguably relevant to its conclusory restatement. The safe defense for such a defendant —with respect to every arguably material utterance in the actual statement that is also arguably relevant to the indictment's conclusory language—is to prove that he did not utter it or that it was true. Even then he faces the threat that without regard to specifics the gist of the entire statement may be viewed as conforming to the indictment's charge. An indictment which leaves in this dilemma a defendant who has given

---

7. Another aspect of the traditional test for fatal variance involves the inquiry whether the indictment and proof corresponded sufficiently to afford the defendant protection against reprosecution for the same offense. See Berger v. United States, 295 U.S. at 82, 55 S.Ct. at 630, 79 L.Ed. at 1318. We need not undertake this inquiry. Russell v. United States, 369 U.S. 749, 82 S.Ct. 1038, 8 L. Ed.2d 240 (1962), makes clear that it is separate from the "sufficient notice" test and that failure under either test compels reversal of a conviction on the ground of nonharmless variance.

8. Materiality is an essential element of a § 1001 offense. Brethauer v. United States, 333 F.2d 302 (CA8, 1964).

a lengthy and detailed statement is outside the allowable range of variance.[9]

The argument is made that with the evidence in, the jury could, under sufficiency of evidence standards, infer that the various parts of the statement which it considered to be untrue added up to a claim of a "severe beating" (etc.). But this is not the test for fatal variance. Leaving aside the question whether "the jury ought [to] be left to ponder such interpretive leaps," United States v. Lambert, 470 F.2d at 356 (panel opinion), the mere fact that jurors might reasonably agree with the recharacterization of the actual statement does not cure the prejudicial impact upon the defendant of an indictment which, as it turns out, did not sufficiently apprise him of what evidence he must marshal and present.[10]

Events in this trial demonstrate the manner in which variation between the indictment and the evidence concerning the utterance charged infect the issue of whether what the defendant said was true. At trial both police officers acknowledged that they struck defendant with slapjacks. One officer stated that he struck Lambert one time on the knee or leg. In denying a motion for judgment of acquittal the trial judge, out of the jury's hearing, described as a "false report" the [purported] statement [by defendant] that he has been "severely beaten about the face." The judge, referring to the foregoing testimony by the officer, also commented that the "tap on the knee" was quite different from "severely beaten about the face." But "severe beating" was the grand jury's term, not appellant's. Thus the court measured departure from the truth by beginning at a fictitious starting point, the restated characterization of the indictment, rather than with what defendant in reality had said. The other officer had testified that he struck defendant "alongside of the head," which tended to show the truth of defendant's *actual* statement that he had been struck about the head and face.[11]

What we have already said applies with as much or more force to the third prong of what the indictment charged Lambert with uttering:

Fred Lambert stated and represented that he had been severely beaten and subjected to illegal and unnecessary punishment by two members of the Tampa Police Department, Tampa, Florida, *in violation of his Civil Rights* . . . . (emphasis added).

This restatement couples the claim of civil rights violations with that of being beaten and subjected to punishment. The actual statement was this:

I feel that my civil rights have been violated because I was arrested for no

9. With respect to the phrase "illegal and unnecessary punishment" the problem for the defendant is even more pronounced, since that reference connotes not only a wider range of events than physical contact but also specific intent on the part of the officers. Appellant asserted that he was arrested for no reason, which might in itself reasonably be regarded as punishment. He said that he felt he should have been permitted to stay in the hospital instead of being transferred immediately to jail. Also, he stated that he had been searched, fingerprinted, and locked in a cell overnight.

10. We have mentioned the prosecution's freedom in presentation of its case to selectively choose from the statement and to emphasize its overall tenor as well. The same options surface again when the defendant moves for dismissal on variance grounds or on appeal urges variance. The government can counter with the argument that specific portions of the statement (but not necessarily those focussed upon in the evidence) were sufficiently definite to let the accused know what he should have been prepared to defend against, and that the indictment language accurately summarized the overall tenor of the entire statement. On this appeal the government has made both arguments.

11. This approach spilled over to the jury instructions. The court charged that the government had the burden of proving that the defendant made a false written statement "as set forth in the indictment," and he read the indictment to the jury, preceded by the statement, "I am going to read it again so you will see what this is *precisely* about." (emphasis added).

reason by two men in plain clothes. The two men fractured and lacerated my nose, as well as injuring my eyes and arms. In view of my condition, I feel that I should have been permitted to stay in the hospital and not have been taken to the police jail to be booked. I feel that my rights were violated by the two men who identified themselves to me as detectives, names unknown to me.

It is readily apparent that the most specific claim of violation of "civil rights" is that of arrest without reason. Whether the claim includes the charges that the officers fractured and lacerated Lambert's nose and injured his eyes and arms, and took him to jail for booking instead of leaving him in the hospital, is a question of interpretation. This aspect of Lambert's statement, rewritten to tailor it to the wishes of the draftsman of the indictment, when laid against the actual statement, presents too wide a variation.

We pretermit the issue of whether Lambert's "feeling" that his "civil rights" were violated was a statement of opinion (with respect to which a jury charge was asked and refused) or a statement of law rather than of fact, since the restated wording of the indictment varied so widely from the actual statement.

The opinion of the panel is vacated. The decision of the District Court is reversed and the cause remanded to the District Court.

## APPENDIX "A"

Tampa, Florida
August 4, 1969

I, Fred Lambert make the following voluntary statement to John Edward Hegarty, who has identified himself to me as a Special Agent of the Federal Bureau of Investigation.

I was born on February 28, 1931 in Jefferson, North Carolina. I reside at 218 Beach Place, Tampa, Florida and I am employed as a waiter at Licata's Steak House, 312 Tampa Street, Tampa, Florida. I have served in the United States Army and United States Marine Corps and have received honorable discharges.

At approximately 2:00 a.m. on Thursday, July 30, 1969, while walking home from work on Parker Street, Tampa, Florida, I stopped to light a cigarette. I had difficulty in lighting the cigarette because of poor matches. At this time a man came from across the street and said that he was waiting for a ride and if he did not have a ride he would have no place to stay. I did not say anything to this man.

This man was white, approximately early 30's, about 5'9", 165 lbs, wearing sport coat, turtle neck shirt. He appeared to be wearing dirty clothes and his general appearance appeared to be dirty.

I continued on my way home and observed this man following about four or five feet behind me. He followed me for about five or six blocks. When I came to 218 Beach Place, I started to walk into the driveway, at which time the man who had been following me, came up to me, showed a badge and said he was a detective and I was under arrest. I said "You can't hold me, I haven't done anything." The man then threw me to the pavement and was joined by another man, who said he was a detective.

The second man was white, in his 40's, about 5'11", 180 lbs, wearing sport shirt and pants.

The second man put handcuffs on me and began to twist on the handcuffs so that I was in much pain. I told the two men that they were hurting me and to let me go as I had not done anything.

The two men picked me up and placed me in a car that was up the street a short way. I cannot describe the car. I was placed in the back seat. I tried to open the door to get out at which time both men hit me with slapjacks on the head, face and arms. I was hit many times. I began to bleed from the nose and I was in much pain.

One of the men stated that it looked as though I should be taken to the hospi-

tal. The men drove me to the Tampa General Hospital. I was taken to the emergency entrance, I was put on a stretcher and was taken to an operating room. A doctor worked on my nose and placed a splint and bandages on my nose. I was very weak and in pain..

The two men then told me that they were going to take me to the police station to be booked. The two men who told me this were not the two men who had arrested me but were two police officers in uniform. I told the two police officers that I had not done anything. The two police officers got hold of my arms at the wrist and twisted me off the table.

I cannot describe the two police officers in uniform and I do not know their names.

I was placed in a police wagon and was taken to the Tampa Police Department Jail. I was searched and fingerprinted and was placed in a cell on the same floor as the booking desk. I was not photographed by the Tampa Police Department.

I later was taken to a cell on the second floor at which time I called a friend, who in turn called a bondsman for me. The bondsman was Sam Ferlita. I was bonded out somewhere between eight and nine in the morning.

Later that morning I went to the office of Dr. Claude M. Burpee, 1401 Swann Ave, Tampa, Florida for additional treatment. I have been treated by Dr. Burpee on August 4, 1969 and have another appointment on August 6, 1969.

I feel that my civil rights have been violated because I was arrested for no reason by two men in plain clothes. The two men fractured and lacerated my nose as well as injuring my eyes and arms. In view of my condition I feel that I should have been permitted to stay in the hospital and not have been taken to the police jail to be booked. I feel that my rights were violated by the two men, who identified themselves to me as detectives, names unknown to me.

I would like to add that after leaving work after midnight on July 30, 1969, I stopped to have two bottles of beer and then proceeded to walk home as is my usual custom.

I have read this statement concisting [sic] of this page and three other pages, and it is true and correct to the best of my knowledge.

/s/ Fred Lambert

WITNESS John Edward Hegarty, SA, FBI, Tampa, Fla. 8/4/69

TUTTLE, Senior Circuit Judge with whom BROWN, Chief Judge, and WISDOM, THORNBERRY, GOLDBERG, SIMPSON and MORGAN, Circuit Judges, join (concurring in part and dissenting in part):

I concur, of course, in the disposition of this case by the Court. No less than does the majority of the Court, I consider that there was an impermissible variance between the indictment and the proof upon which Lambert was convicted.

Without intending unnecessarily to belabor the issue, however, I dissent from that part of the opinion which vacates the prior decision and opinion in this case and which holds that section 1001 comprehends false statements made to the Federal Bureau of Investigation. I am strongly of the view that, since Lambert's statement to the FBI did not relate to a pecuniary claim against the government the question then was only whether his allegedly false report in any sense "perverted" the normal functioning of the FBI. I think not. As stated in the original opinion:

"Indeed when appellant went into the Tampa office of the FBI, he went to ask that agency to do what it normally does, that is, to investigate. *The normal function of the FBI was to ascertain whether Lambert's statements were true or false* and the mere fact that they were, upon investigation, found to be false does not mean, *ipso facto*, that they worked a perversion of the FBI's regular business." (Emphasis in original) 470 F.2d 354, 359. Fn. omitted.

I can imagine no more important national policy than that of preserving an open line of communication between private citizens and law enforcement agencies. Therefore, without attempting to reargue what was contained in the original opinion of the Court, I feel it appropriate to repeat the following language which was used there, and which I feel even more strongly now is appropriate:

"We are all familiar with the possibilities that arise when an individual makes a complaint concerning law enforcement officers (local or national). He is often met with a difficult or impossible burden of proof. If feelings run high, the ones complained against may feel strong enough of their position to seek an indictment under such a statute as this. Need we speculate on the chilling effect of such punitive possibilities on even the person who is honest and acting in good faith?"

I would reverse the judgment on the ground that 18 U.S.C.A. § 1001 has no application to the facts of this case and remand the case to the district court with instructions to dismiss the indictment.