**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**John Clayton MASSEY,**
**Defendant-Appellant.**

**No. 76–2595.**

United States Court of Appeals,
Fifth Circuit.

April 8, 1977.

Allan P. Clark, Jacksonville, Fla. (Court-appointed), for defendant-appellant.

John L. Briggs, U.S. Atty., Robert S. Yerkes, Asst. U.S. Atty., Jacksonville, Fla., for plaintiff-appellee.

Before JONES, COLEMAN and TJOF-LAT, Circuit Judges.

COLEMAN, Circuit Judge.

John Clayton Massey has been convicted on a one-count indictment charging a violation of 18 U.S.C. § 1001:

§ 1001. *Statements or entries generally*

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

The indictment charged that Massey willfully and knowingly stated to the Federal Bureau of Investigation (FBI) that he was engaged in, and had knowledge of, a conspiracy to assassinate President Ford and Senator Edward Kennedy and that these statements were false. Massey was sentenced to two years: six months in jail, the remainder suspended, and a two year probationary period imposed.

We reject the arguments that the indictment failed to charge an offense and that the evidence did not support a conviction within the meaning of the statute.

We agree, however, that a violation of *Miranda* standards mandates a reversal of this conviction.

## I. FACTS

Viewed in the light most favorable to the verdict, the circumstances are as follows: At approximately 8:30 a. m. on September 24, 1975, Massey telephoned the office of the Resident Agent of the FBI at Ocala, Florida. Massey said that he desired to furnish the FBI with information concerning a conspiracy to kill President Ford and Senator Kennedy.

*Testimony of FBI Agent Anderson.*
*(Extraneous Matter Omitted.)*

"As I answered the telephone, the individual speaking said his name was John Smith and that he desired to furnish the Federal Bureau of Investigation some information concerning a conspiracy to kill President Gerald Ford and Senator Ted Kennedy. He stated that there were two assassination teams consisting of four or five men each and that these teams had been undergoing training in South Carolina and Georgia and that one team was there and another team like it was on the West Coast, possibly in California.

"He indicated that he had been recruited by an unidentified male and that this person was one of the members of the group in South Carolina and Georgia, and that they were identified to him only as "A", "B", "C" and "D".

"Smith stated that he was the wheel man, or the person that would be driving the car in this particular type of a conspiracy, and his group was composed all of war veterans and that he was actually supposed to meet them on Friday in Atlanta, Georgia.

"He stated that they planned to accomplish the assassination by utilizing one of these following methods:

"Of dropping a bomb by plane over a place where President Ford or Senator Kennedy might be speaking; by throwing hand grenades; by using rockets in rocket launchers.

"And at this point, because of the type of information he was furnishing on the phone, I told him that I would like to talk to him personally to get more information about this matter.

"At that time, he said that he did not want to come to the office of the Federal Bureau of Investigation because he felt that someone would be checking on his activities.

"He suggested that we meet at a place just east of Silver Springs, Florida, on U.S. 40, and we decided that we would meet

right there; it's by the Oklawaha bridge, at 9 o'clock that same day.

"I proceeded immediately, because there were no other Agents at that time available in the Ocala Resident Agency, alone to this spot on the Oklawaha bridge where I met with this individual.

"I met with an individual who was driving a white panel truck. And at that time, he still indicated his name was John Smith. And it was not until the conclusion of the time that I talked with him and after I had talked with him for some time did he actually finally identify himself as being John Clayton Massey."

[Q. Now, what did he tell you at that time?]

"He said that some time in June of 1975, he had been employed as a service station attendant at the Super Test Station in— well, it's near Belleview. It's Interstate 75 and State Road 484 and he said a white male, approximately 50 years of age, described as 5 feet 7 to 5 feet 8, about 210 pounds, gray hair, wearing glasses and driving a late model white Eldorado Cadillac, drove into the service station. He had some conversation with Massey and then he asked Massey if he were interested in making a large amount of money, and Massey indicated that he was.

"So at that time, the white male told Massey to quit his job near Belleview where he was and to return to his home in Georgia and arrange a basis for a separation from his wife and to await further instructions from this individual.

"Massey told me that he followed the individual's instructions and went back to the home of his mother, who was Mary Agnes Massey. She lived at 550 Grove Street in Royston, Georgia.

"About two weeks after returning to Royston, on about July 4th of 1975, he received a telephone call from another unidentified male and that person instructed him to meet him at the Pure Town Truck Stop at Interstate 85 at Fair Play—Fair Play, South Carolina, and that was to be that evening at 11:00 p. m.

"Massey stated that this individual, when he met him, referred to himself as "Bud" only. He was about 35, sandy hair, crew cut, 6 feet, 170 pounds.

"Bud and Massey then drove to a wooded area nearby where Massey met four additional white males and their ages ran from 25 to 30 years of age.

"They were only addressed by Bud in front of Massey as "A", "B", "C", and "D".

"Massey was, he said, referred to as "E".

"At that time, Bud stated and told Massey that the group was organized as a mercenary group to fight with the revolutionary elements in South America or Central America, some country like Ecuador or Guatemala.

"Well, after meeting Bud and these four individuals, Massey stated he went back to his mother's home.

"Massey then stated that during July, he received instructions by telephone, again from an unidentified male, to meet with the group for guerilla training. The group would go to isolated areas, wooded areas, where they would camp out overnight and they would remain there several days while in training.

"Massey said he was unable to pinpoint specifically the locations but he could locate them if he went there with an Agent.

"He said that these areas were located in several places south of Columbia, South Carolina. One location was south of Washington, Georgia, near Lake Clark Hill; and another area was north of Greenville, South Carolina.

"During the training, he said the group fired .303 caliber British Enfield rifles. They practiced throwing hand grenades at bull's-eye targets laid upon the ground and they used rockets in rocket launchers.

"And at one point, Massey stated, during the training while they were there, one of the unknown subjects, who was called "B" but Massey learned was named Joe, no last name, they went to a bar, not further identified by Massey, in South Carolina, where they drank heavily. And during this con-

versation in this bar with "B" or Joe, Joe told him that the purpose of the group that they were affiliated with was not to fight revolutionaries in South America but it was specifically organized by an unidentified individual or individuals to assassinate President Ford and Senator Kennedy, and there was a second group of four or five men that were organized in training like the group Massey was to be in—that was training somewhere on the West Coast, Massey believed was California, and one of the members of the Western group supposedly was a pilot.

"Now, according to the assassination plan, attempts were going to be made to assassinate President Ford and Senator Kennedy some time between then and the party conventions in 1976.

"The plans included the possibility of bombing an area where President Ford might be speaking, or bombing the Kennedy's compound at Hiannisport, Massachusetts, or using hand-grenades or rocket launchers aimed at hitting Ford and Senator Kennedy in places where they might be speaking.

"Now, according to what Joe told Massey, the reason for this attempt to assassinate Kennedy was because of the fact that the individuals who had organized the conspiracy were afraid that Senator Kennedy might be get elected President if Ford was assassinated; and because of the fact that they did not want Senator Kennedy to be President, they included him in this assassination plot.

"Massey also stated that, at this meeting I had with him, he was also supposed to meet one of his group in the westbound lane of Interstate 20 west of Interstate 75 in Atlanta, Georgia, between 10:00 o'clock and 12:00 o'clock noon on September 26 of 1975.

"Massey was supposed to be in this white van that he drove and on the side of the road and some individual would drive by, honk his horn, and Massey would then follow this car and get further instructions after making contact with this person.

"He told me, Massey did, he had already received $5,000 from the group and they had paid it to him in two twenty-five hundred dollar installments, and he got them in $100 bills and $20 bills.

"He stated that it was his duty to report this information to the Federal Bureau of Investigation, but because of his deep involvement in this plan to date, he wanted one thousand dollars in payment to meet with members of the group as scheduled in Atlanta just two days hence, and he wanted another $4,000 if he continued his affiliation with the group.

"At that time, I told him I did not have the authority to make a decision on my part without consulting further with my superiors, who are in Jacksonville, Florida, and I told Massey at that time that he could call me at my office, located here in the Federal Building at the Ocala Resident Agency at 1:30 on that date; and essentially, we concluded our conversation at that time."

Massey contacted Anderson at 1:00 p. m. that same day and arranged a second meeting at a truck stop near Ocala. At this meeting Anderson informed Massey that the FBI would pay him the $5,000 for his continued assistance, on the condition that he take a polygraph examination concerning the information he had furnished. Massey declined to submit to a polygraph examination. At that time Anderson told him that if the information he had furnished was not true he could be guilty of furnishing false information to a government agency; if the information was correct, he could be guilty under the presidential assassination statute. Massey agreed to recontact Anderson at 3:30 p. m. that same day concerning his decision.

At 3:30 Massey called Anderson and indicated that he did not want to take the polygraph examination. Although he would not identify his location, Massey assured Anderson that he would not leave the Ocala area and would telephone Anderson at 8:30 a. m. the next morning.

Massey was arrested at 7:45 p. m. that night on a complaint charging him with willfully and knowingly conspiring to kill

President Ford. Eventually the conspiracy complaint was dismissed. A new complaint was filed, charging Massey with a violation of 18 U.S.C. § 1001.

## II. VALIDITY OF CONVICTION UNDER 18 U.S.C. § 1001

Initially, appellant argues that the indictment and the evidence are insufficient to establish a crime under 18 U.S.C. § 1001. He contends that information concerning an investigative function of the FBI is not a "matter within the jurisdiction of a federal agency", and that oral, unsworn and unrecorded statements are not "statements" within the meaning of the statute.

■ The origin and history of 18 U.S.C. § 1001 have been thoroughly reviewed in a number of cases and will not be repeated here. *See, e. g., United States v. Bramblett,* 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594 (1955); *United States v. Gilliland,* 312 U.S. 86, 61 S.Ct. 518, 85 L.Ed. 598 (1941), and *United States v. Stark,* 131 F.Supp. 190 (D.Md., 1955). The false statement statute is necessarily couched in very broad terms to encompass the variety of deceptive practices which ingenious individuals might perpetrate upon an increasingly complex government. Although appellant argues for a narrow construction of the phrase "matter within the jurisdiction of a federal agency", the 5th Circuit has held that the phrase must be given a broad, non-technical meaning in order to accomplish the purpose of the statute. *United States v. Lambert,* 5 Cir. 1974, 501 F.2d 943.

■ In *Lambert* we held that statements to the FBI "falsely pointing to possible criminal conduct that is within the power of the FBI to investigate carry a substantial potential for wasting the Bureau's time and thus perverting its central function. . . [S]uch a statement is a 'matter within [FBI] jurisdiction' under § 1001." 501 F.2d 946. In Massey's case the jurisdictional requirement is undoubtedly satisfied.

Appellant also argues that § 1001 is inapplicable because the statements were oral and unsworn. He urges that since the statements were untranscribed they are unreliable as a starting point for a false statement prosecution because they are merely the recollection of a federal policeman.

■ The United States Supreme Court has already recognized that there is no distinction between oral and written statements under the statute. *United States v. Beacon Brass,* 344 U.S. 43, 46, 73 S.Ct. 77, 97 L.Ed. 61 (1952). The words of the statute itself make it plain that oral statements are included since it speaks of " . . . fraudulent statements or representations, or . . . false writing or document". Also, a statement does not have to be made under oath. *United States v. Adler,* 2 Cir. 1967, 380 F.2d 917, 922, *cert. denied,* 389 U.S. 1006, 88 S.Ct. 561, 19 L.Ed.2d 602, and cases therein cited.

The Fifth Circuit has noted with approval that "[c]ourts have applied this statute [18 U.S.C. § 1001] to oral as well as written statements and unsworn as well as sworn statements". *United States v. Krause,* 5 Cir. 1975, 507 F.2d 113, 117. Three other Circuits have held that statements which were oral, unsworn, and untranscribed were sufficient "statements" to prove a crime under § 1001. *United States v. Isaacs,* 7 Cir. 1974, 493 F.2d 1124, *cert. denied* in *Kerner v. United States,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146; *United States v. Ratner,* 9 Cir. 1972, 464 F.2d 101; *United States v. Adler, supra.* ·

This was no good faith effort of a private citizen to aid law enforcement agencies and it had the effect of wasting the Bureau's time and effort. The jury found that Massey initiated contact with the FBI knowing full well that the information he was providing was false. As a result, the FBI expended approximately 200 man-hours in six southern states investigating the validity of Massey's story. The statute is clearly intended to cover situations in which a person voluntarily seeks out a government agency with a statement which he knows to be false and which he has every reason to expect the agency to pursue.

Accordingly, the appellant's arguments on this topic are without merit.

### III.  MOTION TO SUPPRESS ADMISSIONS TO FBI

Appellant next assigns as error the District Court's refusal to suppress statements made to an FBI agent.  Instead of honoring appellant's repeated refusals to discuss the assassination plot and his request to see an attorney, the FBI continued to interrogate him from the time of his arrest until he finally signed a waiver of his rights and thereafter made damaging admissions to an FBI agent.  This conduct, appellant argues, violated his right to cut off interrogation as set out in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The facts show that Massey was verbally advised of his *Miranda* rights upon his arrest.  Upon arrival at the FBI office in Ocala, he was provided with an "Advice of Rights" form which was explained and which he declined to sign.  According to Agent Anderson's testimony, Massey said that he wished to talk to an attorney before talking to the FBI, and no further interrogation was attempted that night.  Before being taken to the Marion County jail, where he remained overnight, Massey and the FBI agents engaged in "small talk" unrelated to the case.

Massey testified that he informed Agent Anderson that night that he wished to call an attorney and knew of one in the Ocala area, whom he could have called.  Both arresting officers, however, testified that he made no request "to call an attorney", and if he had, the request would have been noted on an arrest log.

The following morning, before being transported to Jacksonville to appear before the U.S. Magistrate, Massey was again advised of his *Miranda* rights by Agent Anderson and Agent Ted R. Tucker.  During the 100-mile trip, Anderson asked Massey whether he was telling the truth but again Massey stated that he did not want to discuss the plot.

They arrived in Jacksonville at approximately 8:30 a. m.  Instead of being placed in a detention cell, Massey was taken to the FBI office where he waited more than three hours before his hearing could be scheduled.  Once again he was interviewed, this time by Secret Service Agent Kingsley Fisher.  Again Massey was read his rights but refused to sign a waiver and refused to discuss the plot until he had talked with an attorney.

Fisher testified that Massey then indicated that he wanted to tell Fisher something else that was not about the plot.  Although Fisher told Massey that he did not have to tell him anything, Massey continued.  Massey said that the FBI had nothing to worry about, that when he was in a bar in Ocala, he overheard an unidentified drunk talking about a plot to assassinate President Ford and Senator Kennedy.  He felt that the FBI had over-reacted to his story.

Agent Tucker was present during this interview with Agent Fisher and heard Massey's statements.  Approximately 30 minutes later he attempted to reinterview Massey as to his itinerary between mid-June of 1975 and mid-September of 1975.  Assured that Tucker only wanted information about his itinerary and not about the plot, Massey signed the waiver of rights form and gave Tucker the information.  This information provided the government with details as to appellant's whereabouts during the time of the alleged plot and with witnesses who had seen appellant during this time.

Massey's statements to Agent Fisher were suppressed by the District Court, on the ground that no waiver of rights form was signed prior to those statements.  If these statements were truly spontaneous they might have been properly admitted.  *United States v. Vasquez*, 5 Cir. 1973, 476 F.2d 730.  According to Agent Fisher, Massey specifically said that he was not going to tell him about the plot but about "something else".  This information was volunteered and does not seem to be the result of interrogation or indirect attempts to gain information.

The District Court admitted Massey's statements to Agent Tucker on the ground

that the waiver of rights form was signed before the statements were made.

Appellant argues that all statements should have been suppressed as the product of continued police attempts to interrogate him in violation of his right to cut off questioning.

■■■ Both parties rely on different aspects of the recent Supreme Court decision in *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). *Mosley* specifically states that "[t]he present case does not involve the procedures to be followed if the person in custody asks to consult with a lawyer . . . . Those procedures are detailed in the *Miranda* opinion." 423 U.S. 101 at n. 7, 96 S.Ct. 321, at 325. Thus, we must turn to *Miranda* which provides in clear and unequivocal language:

*If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.* At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

This does not mean, as some have suggested, that each police station must have a "station house lawyer" present at all times to advise prisoners. It does mean, however, that if police propose to interrogate a person they must make known to him that he is entitled to a lawyer and that if he cannot afford one, a lawyer will be provided for him prior to any interrogation. If authorities conclude that they will not provide counsel during a reasonable period of time in which investigation in the field is carried out, they may refrain from doing so without violating the person's Fifth Amendment privilege so long as they do not question him during that time.

If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. *Escobedo v. Illinois*, 378 U.S. 478, 490, n. 14 [,84 S.Ct. 1758, 1764, 12 L.Ed.2d 977]. This Court has always set high standards of proof for the waiver of constitutional rights, *Johnson v. Zerbst*, 304 U.S. 458 [,58 S.Ct. 1019, 82 L.Ed. 1461] (1938), and we re-assert these standards as applied to in-custody interrogation.

*Miranda v. Arizona*, 384 U.S. at 474–475, 86 S.Ct. at 1628 (emphasis added).

■■■ In construing this language the Fifth Circuit has said:

Where there is a request for an attorney prior to any questioning, as in this case, a finding of knowing and intelligent waiver of the right to an attorney is impossible. . . . [T]he suspect has an absolute right to delay interrogation by requesting counsel. If such a request is disregarded and the questioning proceeds, any statements taken thereafter cannot be a result of waiver but must be presumed a product of compulsion, subtle or otherwise. The statement . . . should not have been admitted.

*United States v. Priest*, 5 Cir. 1969, 409 F.2d 491, 493.

In *Priest* the police officer was conducting a custodial interrogation of the defendant in a hospital where defendant was confined; *Miranda* warnings were given and an attorney requested. This request was ignored, the interrogation proceeded, and a confession obtained.

The government attempts to overcome this unqualified pronouncement by arguing that by signing the waiver form Massey knowingly and voluntarily waived his Fifth Amendment privilege in the limited area of his itinerary. *Vasquez, supra,* held that in subject areas wherein a defendant has expressed a desire to talk the police may continue speaking.

■■■ However, a valid waiver will not be presumed simply from the fact that a confession was in fact eventually obtained, *Mi-*

*randa,* 384 U.S. at 475, 86 S.Ct. 1602, or that a waiver was eventually signed. The record must show that "an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not a waiver." 384 U.S. at 475, 86 S.Ct. at 1628. *See also United States v. Blair,* 5 Cir. 1972, 470 F.2d 331, 338, *cert. denied,* 411 U.S. 908, 93 S.Ct. 1536, 36 L.Ed.2d 197.

■■■ With reference to Massey's purported itinerary as disclosed to Agent Tucker, a knowing and intelligent waiver has not been shown. Only after four separate attempts at interrogation did Massey sign the waiver form and then only after assurances from Tucker that it was for the limited purpose of establishing his itinerary. Tucker did not tell Massey that this information was desired in order to be able to corroborate or refute his story. This Court has expressed its disapproval of attempts by investigative officers to indirectly gain information as to those matters about which a suspect has already indicated he does not wish to talk. *United States v. Vasquez, supra.* The Seventh Circuit has amplified this thought thus:

> Both the letter and spirit of the Supreme Court's decision in *Miranda* call for condemnation of even this seemingly innocuous police conduct. The procedural safeguards imposed in that case were premised upon the observation that custodial interrogation in the absence of defense counsel is inherently intimidating and destructive of free enjoyment of the constitutional privilege against self-incrimination. To be effective, those safeguards must be fully observed, and the rights of the suspect must be jealously guarded. Not even the slightest circumvention or avoidance may be tolerated. The rule that interrogation must cease, in whole or in part, in accordance with the expressed wishes of the suspect means just that and nothing less. Once the privilege has been asserted, therefore, an interrogator must not be permitted to seek its retraction, total or otherwise.

> Nor may he effectively disregard the privilege by unreasonably narrowing its intended scope.
>
> *United States v. Crisp,* 7 Cir. 1970, 435 F.2d 354, 357.

There was no suggestion that Massey's refusal to discuss anything about the assassination plot was in any respect ambiguous. Nor does it appear that Massey voluntarily and spontaneously invited further discussion of his whereabouts during the summer of 1975. There can be no question that Massey's itinerary during the summer of 1975 was crucially related to whether there had been a conspiracy to assassinate the President and the Senator and as to whether Massey participated in it.

There was ample proof that Massey made the statements charged in the indictment, but the case stood or fell on the *falsity* of those statements. The government had the burden of proving falsity beyond a reasonable doubt. Proof of Massey's whereabouts during the times in question was a vital factor in that proof. The key to it was provided by Massey as the result of continued questioning after he had, four times, declined to talk about the plot before seeing a lawyer. We are thus driven to the conclusion that Massey's statements concerning his itinerary were obtained in violation of his *Miranda* rights and should have been suppressed.

The conviction must be reversed, and the case remanded for further proceedings not inconsistent herewith.

REVERSED and REMANDED.