UNITED STATES of America,
Plaintiff–Appellee,

v.

Eva Shaw COGDELL,
Defendant–Appellant.

No. 87–5050.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 9, 1987.

Decided April 15, 1988.

Todd Clark Conormon, Asst. Federal Public Defender (William E. Martin, Federal

Public Defender, Marjory J. Timothy, Third Year Law Student, on brief), for defendant-appellant.

Patty Merkamp Stemler, Dept. of Justice (Samuel T. Currin, U.S. Atty. Paul Newby, Asst. U.S. Atty., on brief), for plaintiff-appellee.

Before WIDENER, SPROUSE, and WILKINS, Circuit Judges.

SPROUSE, Circuit Judge:

Eva Shaw Cogdell appeals her conviction of filing a false claim against the United States, 18 U.S.C. § 287, and of making a false statement in a matter within the jurisdiction of an agency of the United States, *id.* § 1001. A jury found that Cogdell applied for and cashed a replacement tax refund check after she had already cashed the original refund check. The jury also found that Cogdell made false statements to an agent of the United States Secret Service who investigated her receipt of the checks.

Cogdell contends on appeal that both convictions are tainted because the trial court erroneously instructed the jury regarding false exculpatory statements and guilty knowledge. She also argues that the court erred in failing to direct a verdict in her favor on the section 1001 count because, under the "exculpatory no" doctrine, her statements did not violate the statute. We find no merit in Cogdell's objections to the jury instructions, but agree with her contention that her false statements to the investigating officer are not punishable under section 1001, and we reverse her conviction under that statute.

I. Facts

On April 1, 1985, Cogdell presented her 1984 federal income tax refund check in the amount of $860.73 at a grocery store and sought to cash it. Cogdell had shopped at the store regularly and had cashed other checks there on numerous occasions. After consulting the store's manager, the as-sistant manager on duty at the time agreed to cash the check.

In August 1985 Cogdell telephoned the Internal Revenue Service (IRS) to complain that she had not received her refund check. The IRS sent Cogdell a photocopy of the cancelled check and a claim form with which she could apply for a replacement check if she still wished to pursue her claim. Cogdell completed the claim form, stating that she had never received the original check, and submitted it to the IRS on August 29, 1985. The IRS issued a replacement check on September 23, 1985, which Cogdell cashed seven days later. After issuing the replacement check, the IRS referred the matter to the Secret Service for investigation.[1]

The Secret Service agent assigned to the case, Glen Milan, obtained a letter from the grocery store manager describing the manager's dealings with Cogdell. According to the manager, after cashing the original check, Cogdell stopped shopping at the store for about four months. Sometime in August, however, she returned to the grocery store, showed the manager the cancelled original check, and told him that someone else had cashed it. The manager accused Cogdell of lying, and Cogdell denied the accusation.

After receiving the manager's letter and comparing the endorsements on the checks, Agent Milan questioned Cogdell at her home. He advised her that he believed she had cashed the original check and asked her to sign a form admitting having cashed it. Cogdell refused, denying she had ever received the check. Agent Milan then asked her to accompany him to a police station, where he took fingerprints and writing exemplars. After reading Cogdell her *Miranda* rights, Agent Milan resumed his questioning. Cogdell again denied receiving or cashing the original check, and she wrote and signed a statement to that effect. After Agent Milan obtained the opinion of a handwriting expert that the signature on the original check was Cog-

---

1. According to the Government, the IRS routinely issues a new check to replace one claimed to be lost or stolen without first conducting an investigation. Cases in which the original check has been cashed are then referred to the Secret Service for investigation.

dell's, the Government initiated this criminal action against her.

At trial the Government presented Agent Milan's testimony concerning his investigation, as well as the testimony of the assistant manager concerning Cogdell's cashing of the original check, and the manager's account of his later confrontation with Cogdell. The Government also presented the testimony of a handwriting expert that the signature on the original check was Cogdell's.

## II.   The Jury Instructions

We first consider Cogdell's attack on the trial court's instructions to the jury. The trial judge, over Codgell's objection, instructed the jury concerning inferences that it might draw if it found Cogdell made exculpatory statements that later were shown to be false. The judge stated:

> Conduct of a defendant, including statements knowingly made and acts knowingly done, upon being informed of the crime that has been committed or upon being confronted with criminal charges may be considered by the jury in light of all the evidence in the case in determining the guilt or innocence. When a defendant voluntarily and intentionally offers an explanation and makes some statement tending to show his innocence and this his explanation of the statement later is shown to be false, the jury may consider whether this circumstantial evidence points to a consciousness of guilt.

> Ordinarily it is reasonable to infer that an innocent person does not usually find it necessary to invent or fabricate an explanation or a statement tending to establish his innocence. Whether or not evidence as to a defendant's voluntary explanation or statement points to a consciousness of guilt and the significance to be attached to any such evidence are matters exclusively within the province of the jury. A statement or an act is knowingly made or done if made voluntarily and intentionally and not because

of mistake or accident or other innocent reason.

■ Cogdell concedes that this instruction, taken by the trial court from 1 E. Devitt, C. Blackmar & M. Wolff, *Federal Jury Practice and Instructions* § 15.12 (3d ed. 1987), is proper in appropriate circumstances. *See United States v. McDougald*, 650 F.2d 532, 533 (4th Cir. 1981). She argues, however, that it was improper for the court to give the instruction in her case because she only made general denials of guilt. We disagree. Cogdell not only denied cashing the check, but fabricated a false exculpatory explanation, complaining to the grocery store manager that he had allowed someone else to cash her refund check. Her statements justified the challenged instruction.

In instructing the jury on guilty knowledge, the trial judge stated:

> The element of knowledge may be satisfied by inferences drawn from proof that a defendant deliberately closed his eyes to what would otherwise have been obvious to him, a finding beyond a reasonable doubt of a conscious purpose to avoid enlightment [sic] would permit an inference of knowledge. Stated another way, a defendant's knowledge of a fact may be inferred upon willful blindness to the existence of a fact. It is entirely up to you as to whether you find any deliberate closing of the eyes and inferences to be drawn from any such evidence.

> A showing of negligence is not sufficient to support a finding of willfulness or knowledge.

■ Again Cogdell concedes this is a standard instruction, *see* E. Devitt, C. Blackmar & M. Wolff, *supra*, § 14.09, and does not contest its general validity. She argues, however, that the facts developed at trial could not support the conclusion that she deliberately closed her eyes to the truth. This argument also lacks merit. Cogdell based her defense on her assertion that she lacked guilty knowledge, and the evidence at trial was more than ample to justify presenting this instruction to the jury.[2]

---

**2.**   Cogdell's counsel argued at trial that Cogdell     was unable to understand tax forms and had

While Cogdell relies on her jury instruction arguments as a basis for appeal of both her convictions, she also asserts an additional challenge to her section 1001 false statement conviction. Since the objections to the jury instructions discussed above are her only grounds for appeal of her section 287 false claim conviction, we affirm Cogdell's conviction under section 287 and go on to consider her remaining challenge to her section 1001 conviction.

## III. The "Exculpatory No" Doctrine

We agree with Cogdell's contention that her conviction under section 1001 of making false statements to the investigating agent cannot stand. We conclude, applying the "exculpatory no" doctrine, that Cogdell's statements did not violate section 1001, and that the court erred in failing to direct a verdict in her favor.

Section 1001 provides:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully ... makes any false, fictitious or fraudulent statements or representations, ... shall be fined not more than $10,000 or imprisoned not more than five years, or both.

This sweeping language appears on its face to apply to any false statement on a matter within the jurisdiction of a federal agency. The courts have developed the "exculpatory no" doctrine, however, as an exception to the broad provisions of the statute for those denying guilt in response to questioning by law enforcement authorities. The doctrine was articulated first by Judge Chesnut in *United States v. Stark*, 131 F.Supp. 190 (D.Md.1955). After carefully reviewing the legislative history of section 1001, Judge Chesnut stated that Congress intended the statute to "protect the government against false pecuniary claims" and "to protect governmental agencies from perversion of their normal functioning." *Id.* at 205 (citing *United States v. Gilliland*, 312 U.S. 86, 93, 61

S.Ct. 518, 522, 85 L.Ed. 598 (1941)). He determined that the statute was enacted:

to protect the government from the affirmative or aggressive and voluntary actions of persons who take the initiative, or, in other words, to protect the government from being the victim of some positive statement, whether written or oral, which has the tendency and effect of perverting its normal proper activities.

*Id.* He therefore concluded that Congress did not intend the statute to reach false statements that were not volunteered with the intent to induce government action, but were instead exculpatory responses to questioning initiated by government agents. *Id.* at 205–06.

Numerous courts considering the issue since *Stark* have adopted the "exculpatory no" doctrine, but the scope they have afforded it has varied. There is general agreement that section 1001 was not intended to reach mere exculpatory denials of guilt. *See United States v. Medina De Perez*, 799 F.2d 540, 541–45 (9th Cir. 1986); *United States v. Bush*, 503 F.2d 813, 815 (5th Cir.1974); *Paternostro v. United States*, 311 F.2d 298, 305 (5th Cir. 1962). Courts also have recognized an additional justification for the doctrine as a safeguard against applications of section 1001 that are "uncomfortably close to [violating] the Fifth Amendment." *United States v. Lambert*, 501 F.2d 943, 946 n. 4 (5th Cir.1974) (en banc). Some courts, focusing on these fifth amendment considerations, have narrowly limited the doctrine's application to circumstances in which the statute poses a possible conflict with the privilege against self-incrimination. *See, e.g., United States v. King*, 613 F.2d 670, 674–75 (7th Cir.1980) (doctrine does not apply if defendant has been read the *Miranda* warning). Other courts, however, have applied no such limitations, recognizing the privilege against self-incrimination as an additional factor justifying the doctrine rather than as the limit to the doctrine's reach. *See, e.g., United States v.*

---

mistaken the original refund check for a North Carolina state refund that she also expected to receive. The state refund for which Cogdell

applied, however, was only approximately $40, and she had received notice from the state that her refund request had been denied.

*Tabor,* 788 F.2d 714, 718–19 (11th Cir.1986); *Bush,* 503 F.2d at 818–19.

■ Recently, in *United States v. Rodgers,* 466 U.S. 475, 104 S.Ct. 1942, 80 L.Ed.2d 492 (1984), the Supreme Court instructed that section 1001 was designed to cover a broad range of offenses against the United States. In the context of determining whether a false statement concerned a matter within the jurisdiction of a federal agency, the Court stated that Congress' intent to protect governmental agencies from the effects of intentional misinformation should not be frustrated by narrow construction. *Id.* at 480, 104 S.Ct. at 1946. Therefore, we are concerned with preserving the vitality of section 1001 as an effective weapon for protecting the basic functioning of government agencies against scurrilous diversions by deliberate falsehoods. We are persuaded, however, that the "exculpatory no" doctrine is a narrow yet salutory limitation on a criminal statute which, because of its breadth, is subject to potential abuse.[3] Like the Maryland district court in *Stark* and later courts considering the issue, we believe that exculpatory denials made to an officer conducting a criminal investigation were never intended to be within the reach of section 1001. Even without the legislative history supporting this interpretation, a criminal prosecution for denying guilt to a law enforcement officer is offensively close to a prosecution for a statement protected by the constitutional privilege against self-incrimination. Nothing in *Rodgers* counsels against these views.[4]

■ Accordingly, in applying the "exculpatory no" doctrine, we balance the need for protecting the basic functions of government agencies with the concern that a criminal suspect not be forced to incriminate himself in order to avoid punishment under section 1001. We think the Ninth Circuit appropriately balanced these considerations in *United States v. Medina De Perez,* 799 F.2d 540 (9th Cir.1986). In *Medina De Perez,* the court reviewed earlier applications of the "exculpatory no" doctrine and structured a five-part test to determine its proper application. We agree with the Ninth Circuit's reasoning and conclude, as it did, that a false statement does not violate section 1001 when:

(1) it was not made in pursuit of a claim to a privilege or a claim against the government;

(2) it was made in response to inquiries initiated by a federal agency or department;

(3) it did not pervert the basic functions entrusted by law to the agency;

(4) it was made in the context of an investigation rather than of a routine exercise of administrative responsibility;

(5) it was made in a situation in which a truthful answer would have incriminated the declarant.

*Id.* at 544 & n. 5 (test derived from *United States v. Rose,* 570 F.2d 1358, 1364 (9th Cir.1978)), and *United States v. Bedore,* 455 F.2d 1109, 1111 (9th Cir.1972)). This test permits the broad use of section 1001 against false statements that impede normal governmental functions, while at the same time, protecting defendants from prosecutorial overkill or invasion of areas

---

**3.** Recently, in *United States v. Holmes,* 840 F.2d 246, 249 (4th Cir.1988), we noted that this circuit had not yet been presented with the question whether to adopt the "exculpatory no" doctrine. That question is now squarely before us, and we choose to follow the lead of the several circuits that have adopted the doctrine.

**4.** In *Rodgers,* the Court considered whether a false statement made to the Federal Bureau of Investigation and Secret Service fell within the statutory language, "in any matter within the jurisdiction of any department or agency of the United States." 466 U.S. at 478–81, 104 S.Ct. at 1945–47. Thus, the issue before the Court was whether statements made to investigative agencies could *ever* violate section 1001. The defendant in *Rodgers* falsely reported that his estranged wife was involved in a plot to kill the President. *Id.* at 476–77, 104 S.Ct. at 1944–45. Since the defendant did not attempt to raise the exculpatory no doctrine as a defense (and could not realistically have done so), the Court had no occasion to consider or comment on the doctrine. In the Court's holding that false statements to investigative agencies are within the realm of statements covered by the statute, there is nothing to suggest that *all* such statements actually violate the statute.

bordering on the constitutional protection against forced self-incrimination.

■ Applying the test to the present case, we find Cogdell's statements to be within the exception. She filed a false claim against the United States and successfully extracted an undeserved payment. After paying Cogdell's claim, the IRS requested the Secret Service to investigate. When Agent Milan interviewed Cogdell, he was seeking evidence of the crime he believed she had committed. Cogdell's denials during the interview of cashing the original check were not made in pursuit of her false claim. She had already received and cashed the replacement check. Instead, her false statements were uttered in defense to the Government's attempt to prosecute her for having made the false claim.[5]

Cogdell's statements also meet the test's second requirement—that they be made in response to inquiries initiated by a federal agency. Agent Milan went to Cogdell's home to question her about her role in a suspected crime. While the commission of a crime normally results in police investigation, it cannot be said that by committing a crime the criminal is responsible for initiating any ensuing criminal investigation. Such an application of the test would swallow the exception the "exculpatory no" doctrine was crafted to create. *See Paternostro v. United States,* 311 F.2d 298, 305 (5th Cir.1962) (Section 1001 was not intended to reach "negative responses to questions propounded to [defendant] by an investigating agent during a question and answer conference, not initiated by [him].").

Cogdell's statements also meet the requirement that they not pervert an agency's basic functions.[6] A trained agent cannot be overly surprised when a suspected criminal fails to admit guilt. "We presume that a thorough agent would continue vigorous investigation of all leads until he personally is satisfied he has obtained the truth." *Medina De Perez,* 799 F.2d at 546. A false denial of guilt does not pervert the investigator's basic function in the manner the statute was intended to combat, but is merely one of the ordinary obstacles confronted in a criminal investigation. *Id.* at 546; *see also United States v. Lambert,* 501 F.2d 943, 946 (5th Cir.1974) (en banc); *United States v. Bedore,* 455 F.2d at 1109–11 (9th Cir.1972).

The fourth requirement—that the statement be uttered in response to investigative inquiries rather than inquiries that represent routine exercises of administrative authority—touches the core of the reason for the "exculpatory no" exception. False statements that pervert an agency's routine administrative functions are the specific target Congress intended the statute to reach, *United States v. Gilliland,* 312 U.S. 86, 93, 61 S.Ct. 518, 522, 85 L.Ed. 598 (1941), while the exception was created to protect negative responses to interrogation by a criminal investigator. *See United States v. Bush,* 503 F.2d 813, 815 (5th Cir.1974); *Paternostro,* 311 F.2d at 305. "Hence, it is when government agents are acting as 'police investigators' rather than as 'administrators' that this prerequisite for invocation of the 'exculpatory no' doctrine is met." *Medina De Perez,* 799 F.2d

---

5. In *United States v. Olsowy,* 836 F.2d 439 (9th Cir.1988), the defendant made false statements to a Secret Service agent investigating the defendant's claim for a replacement Social Security benefits check. The court held the "exculpatory no" doctrine did not apply. *Id.* at 441–42. In its application of the *Medina De Perez* test, the *Olsowy* court relied on the fact that the claim had not yet been paid and the agent was investigating whether or not it should be paid. *See id.* Thus, *Olsowy* is distinguished from Cogdell's situation on its facts. While we express no opinion concerning the applicability of the "exculpatory no" doctrine where the false statements are uttered in an investigation conducted before the claim is paid, to the extent the *Ol-*

*sowy* court's reasoning differs from ours, we find it unpersuasive.

6. Cogdell's false statements are unlike the false report of a plot against the President's life the Court considered in *Rodgers*. The *Rodgers* court held that the false report perverted the agencies' basic functions by "turn[ing them] into ... Missing Person's Bureau[s] for domestic squabbles." 466 U.S. at 481, 104 S.Ct. at 1947; *see also Bedore;* 455 F.2d at 1111 ("Typical of the kind of statements that are within the purview of section 1001 are false reports of crime made to federal law enforcement agencies that may engender groundless federal investigations.").

at 545. Cogdell's statements, were made to deny her guilt to a law enforcement agent who was investigating her crime. They easily meet the test's fourth requirement.[7]

Finally, an admission by Cogdell that she had cashed the original check would have incriminated her—establishing that she had made a false claim in violation of 18 U.S.C. § 287.

The sanction of section 1001 plays an important role in protecting the effectiveness of government agencies whose functions require them to rely on the accuracy of the information they receive. The statute, however, was not intended to compel persons suspected of crimes to assist criminal investigators in establishing their guilt. The district court should have directed a verdict in Cogdell's favor, and accordingly, we reverse her section 1001 conviction.

The judgment of the district court is affirmed in part, reversed in part, and remanded for resentencing.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR RESENTENCING.

WILKINS, Circuit Judge, concurring in part and dissenting in part:

I concur with the majority's reasoning and affirmance of Cogdell's conviction of making a false claim against the United States in violation of 18 U.S.C.A. § 287 (West 1969 & Supp.1987). However, I dissent from the reversal of her conviction of making a false statement in violation of 18 U.S.C.A. § 1001 (West 1976) on the basis of the exculpatory no doctrine.

I.

This court has previously declined to follow the path now chosen by the majority.[1] The majority's decision to now adopt the doctrine, whether it does so under the rubric of defining the reach of section 1001, or of carving out a judicially created exception to the statute, is nevertheless redrafting the statute. Neither the plain language of the statute nor its legislative history provide a legitimate basis for the majority's conclusion. If Congress had intended this exception, it could have expressly provided for it when the statute was first enacted or by amendment. Congress did not provide such an exception and it is not the duty of the courts to reframe the intent of Congress under the guise of interpretation.

II.

In interpreting legislation we begin with the language as it is written, "[n]ot wishing 'to give point to the quip that only when legislative history is doubtful do you go to the statute.'" *United States v. Bass*, 404 U.S. 336, 339, 92 S.Ct. 515, 518, 30 L.Ed.2d 488 (1971) (quoting Frankfurter, *Some Reflections on the Reading of Stat-*

---

7. The Government contends that Agent Milan's questioning of Cogdell was a routine administrative procedure because the IRS normally refers investigation of suspicious cases to the Secret Service. It argues that the ensuing Secret Service investigation was part of the administrative process of handling claims. We reject this characterization of the investigation. The Government concedes that the Secret Service only is asked to investigate cases in which there are indications of impropriety. That the procedures employed here may be routine does not change the basic fact that the IRS turned to an agency of criminal investigators for help in solving a suspected crime, and that the investigation was essentially criminal in nature.

The facts of Cogdell's case illustrate the criminal nature of the investigative procedures. Agent Milan's conduct in asking Cogdell to accompany him to the police station, fingerprinting her, and reading her the *Miranda* warning demonstrates the purpose of the investigation. Moreover, although the Government will eventually recoup the proceeds of the replacement check, it will do so only because of restitution assessed against Cogdell as part of her *criminal* sentence.

1. In *United States v. Cole*, 622 F.2d 98 (4th Cir.), cert. denied, 449 U.S. 956, 101 S.Ct. 363, 66 L.Ed.2d 221 (1980), the court declined to adopt the doctrine, noting "[w]e express no view as to the merits of the 'exculpatory 'no' doctrine or the correctness of its application in the [voluntary] dismissal of the § 1001 count in this case." *Id.* at 100 n. 2. More recently, in *United States v. Holmes*, 840 F.2d 246, 249 (4th Cir.1988), the court again considered this "judicially created exception to section 1001" but concluded it would not apply under the circumstances presented.

*utes,* 47 Col.L.Rev. 527, 543 (1947)). The statute in its entirety provides:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

18 U.S.C.A. § 1001.

On its face, the plain language of the statute is framed to address the making of "any" false statement or representation, the use of "any" false writing or document knowing it contains "any" false statement or entry, or the concealment or falsification of material facts by "any" trick, scheme, etc., in "any" matter within the jurisdiction of "any" department or agency of the United States. Comprehensive words such as "any", here used six times by Congress within a single one-sentence statute to describe the conduct it intended to address, should be interpreted within their commonly understood meaning. *See United States v. Crisp,* 817 F.2d 256, 259 (4th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 164, 98 L.Ed.2d 118 (1987) (term "all" should be given its comprehensive meaning). In fact, the Supreme Court has concluded "[t]here is no indication in either the committee reports or in the congressional debates that the scope of [section 1001] was to be in any way restricted." *United States v. Bramblett,* 348 U.S. 503, 507, 75 S.Ct. 504, 507, 99 L.Ed. 594 (1955) (footnotes omitted); *see also United States v. Yermian,* 468 U.S. 63, 74–75, 104 S.Ct. 2936, 2942, 82 L.Ed.2d 53 (1984).

In the absence of a clear indication of legislative intent to the contrary, the language of the statute controls. *Ford Motor Credit Co. v. Cenance,* 452 U.S. 155, 158 n. 3, 101 S.Ct. 2239, 2241 n. 3, 68 L.Ed.2d 744 (1981). Attempts at further interpretation are unnecessary:

Our individual appraisal of the wisdom or unwisdom of a particular course consciously selected by the Congress is to be put aside in the process of interpreting a statute. Once the meaning of an enactment is discerned and its constitutionality determined, the judicial process comes to an end. We do not sit as a committee of review, nor are we vested with the power of veto.

*TVA v. Hill,* 437 U.S. 153, 194–95, 98 S.Ct. 2279, 2302, 57 L.Ed.2d 117 (1978).

### III.

One rationale offered for the exculpatory no doctrine is that courts are loath to impose a harsher penalty for a false statement under section 1001 than for a false statement under the perjury statute, 18 U.S.C.A. § 1621 (West 1984), absent the materiality requirement and procedural safeguards of the latter offense. *United States v. Cole,* 622 F.2d at 100. This argument is diminished by actual comparison of the two penalties. Both statutes provide the same maximum term of imprisonment, five years. They differ only as to the maximum authorized fine; section 1001 carries a maximum fine of $10,000 compared with a maximum of $2,000 for perjury.

These "policy arguments in favor of a more limited construction" of section 1001 have been previously addressed by the Court. *United States v. Rodgers,* 466 U.S. 475, 482, 104 S.Ct. 1942, 1947, 80 L.Ed.2d 492 (1984). The Court stated that "[t]he fact that the maximum possible penalty under § 1001 marginally exceeds that for perjury provides no indication of the particular penalties, within the permitted range, that Congress thought appropriate for each of the myriad violations covered by the statute." *Id.* And in *United States v. Gilliland,* 312 U.S. 86, 61 S.Ct. 518, 85 L.Ed. 598 (1941), confronted with a similar argument comparing the penalty under a predecessor provision of section 1001 with the penalty for a related offense, the Court stated that the relationship of one to the other "has no significance in connection with the construction and application of the

[statute]. The matter of penalties lay within the discretion of Congress." 312 U.S. at 95, 61 S.Ct. at 523.

## IV.

The majority notes that "[c]ourts also have recognized an additional justification for the doctrine as a safeguard against applications of section 1001 that are 'uncomfortably close to [violating] the Fifth Amendment.'" Maj. op. at 182 (quoting *United States v. Lambert*, 501 F.2d 943, 946 n. 4 (5th Cir.1974) (en banc)).

Reference to the fifth amendment provides no rationale for limiting the plain language of the statute, for the issue of whether to adopt the exculpatory no doctrine invokes no constitutional question. Cogdell had a constitutional privilege against self-incrimination, but she had no constitutional right to give an untruthful statement. *See United States v. Havens*, 446 U.S. 620, 626–27, 100 S.Ct. 1912, 1916, 64 L.Ed.2d 559 (1980). Cogdell had two choices—she could give a statement or refuse to do so. The latter choice placed her in no jeopardy and her silence could not have been interpreted as an admission of guilt. But, she elected to give a statement and chose to make a false one.

## V.

In recent years courts have unsuccessfully attempted to impose limitations on the provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C.A. §§ 1961–1968 (West 1984 & Supp. 1987), another statute deemed too broadly drafted by Congress. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498–500, 105 S.Ct. 3275, 3286–87, 87 L.Ed.2d 346 (1985); *Russello v. United States*, 464 U.S. 16, 22–25, 104 S.Ct. 296, 300–01, 78 L.Ed.2d 78 (1983); *United States v. Turkette*, 452 U.S. 576, 586–87, 101 S.Ct. 2524, 2530, 69 L.Ed.2d 246 (1981). The message from the Court in these cases has been consistent and it has been simple: "'The short answer is that Congress did not write the statute that way.'" *Russello*, 464 U.S. at 23, 104 S.Ct. at 300 (quoting *United States v. Naf-*

*talin*, 441 U.S. 768, 773–74, 99 S.Ct. 2077, 2081–82, 60 L.Ed.2d 624 (1979)).

While there is an appealing argument that for policy reasons Congress should amend section 1001 by incorporating the exculpatory no doctrine, this is a responsibility of Congress, not the courts.