UNITED STATES of America,
Plaintiff–Appellee,

v.

Robert L. STEELE,
Defendant–Appellant.

No. 87–4083.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 5, 1988.

Decided Feb. 14, 1990.

Arnold Morelli (argued), Bauer, Morelli & Heyd Co. LPA, Cincinnati, Ohio, for defendant-appellant.

Robert C. Brichler (argued), Asst. U.S. Atty., Cincinnati, Ohio, for plaintiff-appellee.

Before KRUPANSKY and RYAN, Circuit Judges; and BROWN, Senior Circuit Judge.

KRUPANSKY, Circuit Judge.

Robert L. Steele (Steele), defendant-appellant, has appealed his jury conviction on four criminal counts: conspiracy to defraud the Internal Revenue Service (IRS) in violation of 18 U.S.C.A. § 371; filing a false partnership income tax return in 1981 in violation of 26 U.S.C.A. § 7206(1); filing a false individual income tax return in 1981 in violation of 26 U.S.C.A. § 7206(1); and knowingly submitting false documents to the IRS in violation of 18 U.S.C.A. § 1001.

The record disclosed the following underlying facts.[1] Steele was a certified public accountant who had founded and was employed by his own accounting firm, R.L. Steele & Company. In May, 1981, Steele formed a partnership with his wife Mary L. Steele, Daniel A. Pelphrey, and his wife Karen Pelphrey, known as Woodland Heights, for the purpose of buying an 81.349 acre tract of real property situated in the Miami Township of Montgomery County, Ohio, which was to be subdivided into nine separate plots and then resold. On May 13, 1981, Steele, acting on behalf of the partnership, negotiated a contract for the purchase of the 81.349 acres with Rhea M. Shields (Shields), the owner of the property, under the terms of which the partnership would pay Shields $32,500 in cash and execute a mortgage in her favor for $229,000. The sale was consummated on July 21, 1981.

On July 21, 1981, immediately subsequent to acquiring the Woodland Heights property, Steele, acting on behalf of his partnership, entered into two separate land contracts to sell an 8.849 acre parcel and a 9.9 acre parcel of the Woodland Heights property to Thomas R. Duerr (Duerr). The purchase price of each parcel was $40,000 or a total of $80,000.

At the time of purchasing the two lots in 1981, Duerr confided to Steele that his total income was derived from distributing controlled substances and that, as a result, he reported only $12,000 to $15,000 per year on his individual income tax returns. Accordingly, since he had no legitimate and identifiable source of income which would justify an $80,000 land transaction and because he was fearful that the purchase of the two parcels of property would attract the attention of the IRS, Duerr suggested that the purchase price for the two lots of Woodland Heights property be recorded to inaccurately reflect a fictitious figure of $20,000 per parcel, or a total of $40,000.

As indicated, the two parcels of land were conveyed by separate land contracts. One of the conveyances identified Duerr's father, Russell R. Duerr, Jr., as the purchaser, while the second conveyance listed Thomas R. Duerr as purchaser. The recorded land contracts reflected an initial $2,000 down payment, with a balance of $18,000 due and payable, on each of the contracts, with an interest rate of 11% per annum compounded monthly and payable in monthly installments of $247.96 until the balance due on each parcel was satisfied. Upon the execution of the land contracts, Duerr paid Steele an additional amount of $40,000 in cash which represented the difference between the actual purchase price of $80,000 and the fictitious sum of $40,000 which was reflected as the purchase price on the officially recorded conveyances. Steele paid $19,500 of this cash payment to the Pelphreys as their share of the proceeds from the sale and retained $20,500 himself.

On March 22, 1982, Steele filed a United States Partnership Tax Return, Form 1065, for the taxable year 1981 on behalf of the Woodland Heights partnership. Steele did not report the $40,000 cash payment which Duerr covertly had paid the partnership on

---

1. On appellate review of a criminal conviction, this court must view the evidence presented during the trial in the light most favorable to the government, including the benefit of all inferences which can reasonably be drawn therefrom. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Adamo,* 742 F.2d 927, 932 (6th Cir.1984), *cert. denied sub nom. Freeman v. United States,* 469 U.S. 1193, 105 S.Ct. 971, 83 L.Ed.2d 975 (1985).

July 21, 1981 as partnership income. Steele also failed to report the $20,500 cash payment on his 1981 individual income tax return, which represented his share of the $40,000 cash payment from Duerr. In contrast, Pelphrey reported the receipt of $19,-500 he had received from Steele as partnership income on his 1981 United States Individual Income Tax Return.

In August, 1985, Duerr and several other individuals were indicted on various drug charges. Simultaneously, the IRS initiated an investigation of Duerr for possible fraudulent evasion of tax liability. On November 10, 1985, IRS Special Agent Dennis Hall (Hall) contacted Steele, and requested information concerning the sale of the two Woodland Heights parcels of land to Duerr in 1981; Steele, however, was not a target of the agent's inquiry. Hall advised Steele that the government required the information concerning payments made by Duerr for the purchase of the two Woodland Heights parcels in conjunction with its investigation of Duerr for possible income tax evasion. Steele advised the IRS agent that he would comply.

Steele immediately thereafter arranged to meet with Duerr at a local restaurant, and after assuring himself that Duerr was not wired to record their conversation, asked him if he intended to enter a plea agreement and turn state's evidence. After Duerr had insisted that he had no such intent, Steele informed Duerr that an IRS agent had contacted him for information about the two Woodland Heights parcels which Duerr had purchased in 1981. Steele told Duerr that he, Steele, would confirm the fictitiously recorded sale prices, and would thereafter avoid further contact with the agent. On November 20, 1985, Steele delivered various documents to Hall relating to the property transactions between Woodland Heights and Duerr, which falsely reflected the purchase price of each of the two conveyed parcels of property as $20,000.

In December, 1985, Duerr plead guilty to one count of filing a false individual income tax statement and one count of using the telephone to facilitate a narcotics transaction and thereafter cooperated with the government. At that time, he disclosed the fraudulent land transactions which had taken place between himself and Steele in 1981. On March 24, 1987, a federal grand jury for the Southern District of Ohio issued a four-count indictment against Steele, alleging in Count I that Steele had conspired to obstruct the IRS in the computation, assessment and collection of income taxes; in Count II that Steele had filed a false partnership income tax return on behalf of the Woodland Heights partnership for the year 1981 by failing to report the full amount of the purchase price of the two lots sold to Duerr, since the return reported only a total sale price of $40,000 rather than actual price of $80,000; in Count III that Steele had filed a false individual federal income tax return for the year 1981 by failing to list the $20,500, which represented his share of the cash payment made to the partnership on July 21, 1981 by Duerr for the unrecorded balance due on the two Woodland Heights plots; and in Count IV that Steele had willfully and knowingly submitted false documents to the IRS agent concerning the true nature and amount of the land transaction between himself and Duerr.

A jury trial resulted in verdicts of guilty on all four counts charged. The district court sentenced Steele to three years imprisonment on Counts I, II, III and IV of the indictment, with the sentences to be served concurrently. Steele timely filed a notice of appeal from the final judgment entered by the district court.

■ On appeal, the defendant has argued that his conviction for submitting false information to the IRS, in violation of 18 U.S.C. § 1001, should be reversed and dismissed as a matter of law, urging that his actions did not constitute conduct which was prohibited under section 1001.[2] Steele

---

2. Section 1001 reads in pertinent part as follows:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully ... makes

has asserted that his false, fictitious and fraudulent statements concerning the sale of the two parcels of Woodlands Heights properties to Duerr were not actionable under 18 U.S.C. § 1001 because they constituted judicially created exceptions within the "exculpatory no" doctrine. In essence, the doctrine provides that, under certain circumstances, the government may not prosecute an individual for false or fraudulent statements which were made in response to questioning initiated by the government where a truthful statement would have incriminated the defendant. *United States v. Equihua–Juarez*, 851 F.2d 1222, 1224 (9th Cir.1988) ("The 'exculpatory no' doctrine provides an exception to § 1001. If certain requirements are met, a person may not be prosecuted under § 1001 for making a false exculpatory response to government investigators."); *accord United States v. Olsowy*, 836 F.2d 439, 441 (9th Cir.1987) ("The exception allows a suspect who is in custody to deny involvement in the crime for which he was arrested without incurring additional criminal penalties."), *cert. denied*, 485 U.S. 991, 108 S.Ct. 1299, 99 L.Ed.2d 509 (1988); *United States v. Tabor*, 788 F.2d 714, 715 (11th Cir.1986) ("[T]he federal courts have held that in some circumstances false statements exculpatory in nature, though made to a department or agency of the United States, are not criminalized by § 1001."). Although several circuits have recognized the "exculpatory no" doctrine, *see, e.g.*, *United States v. Cogdell*, 844 F.2d 179, 182–85 (4th Cir.1987); *United States v. Bush*, 503 F.2d 813, 815 (1974), *reh'g denied*, 511 F.2d 1402 (5th Cir.1975); *United States v. King*, 613 F.2d 670, 674–75 (7th Cir.1980); *United States v. Medina de Perez*, 799 F.2d 540, 541–44, 544–45 (9th Cir. 1986); *United States v. Tabor*, 788 F.2d

714, 718–19 (11th Cir.1986), it is an issue of first impression in the Sixth Circuit.[3]

The "exculpatory no" doctrine, which appears to be receiving widespread acceptance by federal courts of appeals, is anchored, *inter alia*, upon the Fifth Amendment's protection against self incrimination through the use of compelled statements. *See, e.g.*, *United States v. Equihua–Juarez*, 851 F.2d 1222, 1227 n. 10 (9th Cir. 1988); *United States v. Cogdell*, 844 F.2d 179, 183 (4th Cir.1987); *United States v. Tabor*, 788 F.2d 714, 717 (11th Cir.1986); *United States v. Lambert*, 501 F.2d 943, 946 n. 4 (5th Cir.1974) (en banc); *compare United States v. Payne*, 750 F.2d 844, 861–63 (11th Cir.1985). Because the Fifth Amendment prohibits any requirement that an individual respond to a directly incriminating inquiry, *see generally United States v. Alkhafaji*, 754 F.2d 641 (6th Cir. 1985); *id.* at 648 (Krupansky, J., concurring), the "exculpatory no" doctrine recognizes that, under some circumstances, the government cannot prosecute a defendant under section 1001 for having provided a false or fraudulent answer to potentially incriminating questions.

Juxtaposed with the constitutionally protected right against self incrimination is the explicit recognition that Congress intentionally drafted section 1001 in an expansive fashion in order that it be accorded the broadest possible interpretation regarding the situations in which it would come into play. *United States v. Rodgers*, 466 U.S. 475, 479–80, 104 S.Ct. 1942, 1946–47, 80 L.Ed.2d 492 (1984) (quoting *United States v. Gilliland*, 312 U.S. 86, 93, 61 S.Ct. 518, 522, 85 L.Ed. 598 (1941)). "There is no indication in either the committee reports or in the congressional debates that the scope of the statute was to be in any way restricted." *Rodgers*, 466 U.S. at 481,

---

any false, fictitious or fraudulent statements or representations, ... shall be fined not more than $10,000 or imprisoned not more than five years, or both.
18 U.S.C.A. § 1001.

**3.** Defendant has suggested that this court's decision in *United States v. Aarons*, 718 F.2d 188 (1983), *rhg. denied per curiam*, 734 F.2d 1180 (6th Cir.1984), impliedly adopted the "exculpato-

ry no" exception. The decision in *Aarons*, however, did not consider the "exculpatory no" doctrine; the defendant Aarons was prosecuted for not volunteering information to the government. In the present case, Steele was charged with providing false and fraudulent information to the government and, consequently, *Aarons* is inapposite.

104 S.Ct. at 1947 (quoting *United States v. Bramblett,* 348 U.S. 503, 507, 75 S.Ct. 504, 507, 99 L.Ed. 594 (1955)); *see also Medina de Perez,* 799 F.2d at 543 & n. 4 and cases cited therein. Thus, the protection to be afforded to the right against self-incrimination must be balanced with the Supreme Court's teachings in *Rodgers* and its progeny that Congress had specifically intended the provision of section 1001 to be read in as expansive a fashion as is consistent with individual rights. *See, e.g., Cogdell,* 844 F.2d at 183 ("Accordingly, in applying the 'exculpatory no' doctrine, we balance the need for protecting the basic functions of government agencies with the concern that a criminal suspect not be forced to incriminate himself in order to avoid punishment under section 1001.").

■ In striking this balance, the courts have expressed an awareness that the scope of the "exculpatory no" "exception is of necessity limited and does not apply in every case where a question is asked by a government official during the course of an investigation." *Olsowy,* 836 F.2d at 441; *see also Equihua–Juarez,* 851 F.2d at 1224; *Cogdell,* 844 F.2d at 183. In particular, the "exculpatory no" exception has been found inapplicable where, *inter alia,* the particular "government agencies inquiries constituted a 'routine exercise of administrative responsibility,'" or where "the false statement [would] 'impair the basic functions entrusted by law' to that agency."[4] *Medina de Perez,* 799 F.2d at 544 n. 5 (quoting *United States v. Bedore,* 455 F.2d 1109, 1111 (9th Cir.1972) and *United States v. Rose,* 570 F.2d 1358, 1364 (9th Cir.1978) (emphasis omitted)); *accord United States v. Becker,* 855 F.2d 644, 646 (9th Cir.1988); *Equihua–Juarez,* 851 F.2d

at 1224; *Cogdell,* 844 F.2d at 183; *see also Olsowy,* 836 F.2d at 441; *Bush,* 503 F.2d at 815–19. Moreover, the burden rests upon the criminal defendant to prove that the facts presented in his particular situation are appropriate "to invoke th[e] ['exculpatory no'] exception." *Olsowy,* 836 F.2d at 441 & n. 2 (citing *Rodgers,* 466 U.S. at 477, 104 S.Ct. at 1945 and *Medina de Perez,* 799 F.2d at 544 n. 5); *see also Becker,* 855 F.2d at 646.

It is generally regarded that "the 'exculpatory no' exception applies when the inquiring government agent acts as a police investigator and not when the agent's questions constitute a routine exercise of administrative responsibility." *Equihua–Juarez,* 851 F.2d at 1225; *see also Cogdell,* 844 F.2d at 184; *Medina de Perez,* 799 F.2d at 545; *accord Bush,* 503 F.2d at 815 ("Section 1001 has usually been held inapplicable to statements made to government agents acting in a purely 'police' capacity."). "The term 'administrative' has been used in these cases to distinguish situations in which government agents are acting as 'police investigators' rather than as 'administrators.' In routine administrative inquiries, the exculpatory no defense cannot be properly invoked." *Becker,* 855 F.2d 644, 646 (citing *Medina de Perez,* 799 F.2d at 545).

[T]hat the statement be uttered in response to investigative inquiries rather than inquiries that represent routine exercises of administrative authority ... touches the core or the reason for the "exculpatory no" exception. False statements that pervert an agency's routine administrative functions are the specific target Congress intended the statute to reach, ... while the exception was cre-

---

**4.** The courts which have considered the "exculpatory no" exception have generally set forth a five-part test which must be met to invoke the doctrine:

(1) the false statement must be unrelated to a privilege or a claim against the government; (2) the declarant must be responding to inquiries initiated by a federal agency or department; (3) a truthful answer would involve self-incrimination; (4) the government agency's inquiries must not constitute a routine exercise of administrative, as opposed to in-

vestigative, responsibility; and (5) the false statement must not impair the basic functions entrusted by law to the agency.

*Becker,* 855 F.2d at 646; *see also Equihua–Juarez,* 851 F.2d at 1224; *Cogdell,* 844 F.2d at 183; *Medina de Perez,* 799 F.2d at 544 & n. 5. In the case at bar, it is undisputed that Steele had responded to Agent Hall's request for information; that the information was not made in the course of a claim against the government; and that a truthful response by Steele would have been incriminating.

ated to protect negative responses to interrogation by a criminal investigator. *Cogdell*, 844 F.2d at 184 (citations omitted).

In the case at bar, Steele was charged with and convicted of making false statements to the IRS agent who was investigating possible criminal activity by Duerr. During the course of his criminal investigation of Duerr, Hall had requested Steele to provide him with all information within his possession concerning the sale price and financing of the two parcels of land by the Woodland Heights partnership to Duerr. In response, Steele forwarded copies of documents to the IRS agent which indicated that the two plots had been sold for $20,000 each, for an aggregate price of $40,000. In submitting these documents to the IRS agent, Steele represented that they constituted the totality of available information in his possession concerning the sale of the two lots and the financing of that transaction and did not disclose the additional $40,000 which Duerr had paid to the partnership in cash.

"Clearly the agents in the case were not present as tax collectors, privilege conferrers, or regulators—they were policemen." *United States v. Goldfine*, 538 F.2d 815, 822 (9th Cir.1976) (Ferguson, J., concurring in part, dissenting in part).

> That the procedures employed here may be routine does not change the basic fact that the IRS turned to an agency of criminal investigators for help in solving a suspected crime, and that the investigation was essentially criminal in nature.

*Cogdell*, 844 F.2d at 185 n. 7. Accordingly, the inquiries which Hall made of Steele in the instant case were in the course of a criminal investigation, rather than during "a routine exercise of administrative responsibility." *Equihua–Juarez*, 851 F.2d at 1225.

■ Although Hall had requested the information from Steele within the context of a criminal investigation of Duerr, rather than an investigation of Steele himself, that fact does not remove Steele from the ambit of the "exculpatory no" exception. "The 'exculpatory no' exception ... is not limited to situations where an individual is being formally interrogated." *Equihua–Juarez*, 851 F.2d at 1228 n. 8. The doctrine has been equally applied to situations where "seemingly neutral questions constitute interrogation when they are reasonably likely to elicit incriminating information relevant to establishing elements necessary for conviction of the charged offense." *Equihua–Juarez*, 851 F.2d at 1226 (citations omitted).

> [S]ection [1001] does not usher a heads we win—tails you lose philosophy into the criminal justice system. ("If you tell our version of the truth, we will call it an admission and use it against you on the substantive offense; If you tell us something which materially varies from our version of the truth, we will charge you with a § 1001 felony.").

*Goldfine*, 538 F.2d at 821 (Ferguson, J., concurring in part, dissenting in part) (footnote omitted).

Moreover, the "exculpatory no" doctrine has been invoked under circumstances similar to the case at bar, wherein the defendant was interrogated about an underlying criminal investigation of another individual. *See, e.g., Tabor*, 788 F.2d at 715–16 (IRS questioned defendant during criminal investigation of another person concerning her actions in notarizing mortgages); *Bush*, 503 F.2d at 814 (IRS agents questioned defendant after learning of possible kickbacks he had paid to another person under criminal investigation; however, IRS agents did not warn defendant that he was under investigation or suspicion at the time); *compare King*, 613 F.2d at 675 ("This is not a case like *United States v. Bush*, 503 F.2d 813 (5th Cir.1974), in which the government unsuccessfully sought to apply section 1001 to a defendant who gave simple negative exculpatory answers to questions posed pursuant to an investigation of someone else."); *United States v. Johnson*, 530 F.2d 52, 55 (5th Cir.1976) ("Section 1001 does not apply to mere answers, including untruthful ones, to investigators' question...."), *cert. denied*, 429 U.S. 833, 97 S.Ct. 96, 50 L.Ed.2d 97 (1976); *United States v. McCue*, 301 F.2d 452, 455 (2nd Cir.) (The "exculpatory no" doctrine

was held inapplicable because "the appellants *voluntarily* appeared before three representatives of the Treasury under circumstances in which they were well aware of the nature and purpose of the examination[;] [t]hey were accompanied by counsel and they were questioned under oath.") (emphasis added), *cert. denied*, 370 U.S. 939, 82 S.Ct. 1586, 8 L.Ed.2d 808 (1962).

Additionally, the false statements given by the defendant in response to the government's inquiry did not directly threatened to "impair the basic functions entrusted by law" to the IRS. *Olsowy*, 836 F.2d at 441; *Medina de Perez*, 799 F.2d at 544 n. 5; *Bedore*, 455 F.2d at 1111. In *Rodgers* the Supreme Court explicitly recognized the importance of "protecting the integrity of official inquiries." *Rodgers*, 466 U.S. at 481, 104 S.Ct. at 1947 (quoting *Bryson v. United States*, 396 U.S. 64, 70–71, 90 S.Ct. 355, 359–60, 24 L.Ed.2d 264 (1969)). "The amendment indicated the congressional intent to protect the authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described." *Gilliland*, 312 U.S. at 93, 61 S.Ct. at 522; *United States v. Aarons*, 718 F.2d 188, 190 (1983) (same), *reh'g denied per curiam*, 734 F.2d 1180 (6th Cir.1984).

In light of its need for accurate information, admittedly any false information provided to IRS agents in the course of an investigative inquiry would, to some extent, tend to frustrate the government's basic function of monitoring and collecting tax liabilities "because underlying any tax inquiry is the question of monetary loss to the government." *United States v. Chevoor*, 526 F.2d 178, 183 (1st Cir.1975), *cert. denied*, 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976); *accord McCue*, 301 F.2d at 455 ("There is no reason to believe that the administration of the tax laws and the collection of taxes is not one of the processes of government which the statute was designed to protect, or that making false statements about taxes to the representatives of the Treasury is not the kind of interference and obstruction which the statute was intended to prevent."). However, the possibility that an untruthful answer would "impair the basic functions" of the IRS are concomitantly lessened in the context of a criminal investigation, wherein government agents are attempting to determine whether criminal activity has occurred, because "a competent government investigator will anticipate that the defendant will make exculpatory statements," and, accordingly, "a thorough agent would continue vigorous investigation of all leads until satisfied that he has obtained the truth." *Equihua–Juarez*, 851 F.2d at 1225 (quoting *Medina de Perez*, 799 F.2d at 546).

A number of courts have held that the "exculpatory no" exception is applicable under similar circumstances to those presented by the instant case, concluding that a "false statement, given in response to inquiries by government investigative agents in an interview that the defendant did not initiate, [is] not the type of statement that perverts an investigative agency's functions." *Medina de Perez*, 799 F.2d at 546; *accord Cogdell*, 844 F.2d at 184 ("A false denial of guilt does not pervert the investigator's basic function in the manner the statute was intended to combat, but is merely one of the ordinary obstacles confronted in a criminal investigation."); *Lambert*, 501 F.2d at 946 (*en banc* court noting that "an exculpatory denial by a person under investigation may have less potential for misleading" a government agency); *compare Bush*, 503 F.2d at 818 n. 2 (Distinguishing instances where IRS agent acts as a "policeman" from those instances where he merely fulfils an administrative role of collecting information.). *See generally Medina de Perez*, 799 F.2d at 545 n. 6; *Chevoor*, 526 F.2d at 183 n. 9.

> While the Special Agent [of the IRS] may have been disappointed that defendant would not truthfully answer himself into a felony conviction, we fail to see that his investigative function was in any way perverted. The only possible effect of exculpatory denials however false, received from a suspect such as defendant is to stimulate the agent to carry out his function.

*Paternostro v. United States*, 311 F.2d 298, 303–04 (5th Cir.1962) (quoting with

approval from *United States v. Philippe*, 173 F.Supp. 582, 584 (S.D.N.Y.1959)). "[I]t is a fundamental premise of our criminal justice system that the detection of crimes does not depend on assuring that the accused individuals be forced to tell the truth to law enforcement agents." *Goldfine*, 538 F.2d at 825 (Ferguson, J., concurring in part, dissenting in part). Accordingly, because the false statements which Steele made to the IRS agent occurred during the course of a criminal investigation of Duerr's tax liability and fraudulent activity, and because a truthful response by Steele to the IRS agent's inquiry would have been patently incriminating statements regarding his, Steele's, criminal activity, the appellant had satisfied his burden of proving that the false statements at issue in the instant appeal were within the ambit of the "exculpatory no" exception to section 1001.

Steele has alternatively urged that the district court erred in deciding that his failure to have reported some $20,000 on his 1981 federal individual tax form and some $40,000 on the partnership tax form for the same year constituted a materal omission from his tax return. He has argued that the materiality of his failure to report the above sums on the individual and partnership returns was a factual issue to be submitted to the jury. *See United States v. Null*, 415 F.2d 1178, 1181 (4th Cir.1969). *See generally Carella v. California*, ── U.S. ──, ──, 109 S.Ct. 2419, 2421, 105 L.Ed.2d 218 (U.S.1989) (Scalia, J., concurring) (Failure to submit material issue of fact to jury constitutes reversible error "because it ' "invade[s] [the] fact-finding function" which in a criminal case the law assigns solely to the jury.' ") (quoting *Sandstrom v. Montana*, 442 U.S. 510, 523, 99 S.Ct. 2450, 2459, 61 L.Ed.2d 39 (1979) (quoting *United States v. United States Gypsum Co.*, 438 U.S. 422, 446, 98 S.Ct. 2864, 2878, 57 L.Ed.2d 854 (1978) (footnote omitted))); *United States v. Mentz*, 840 F.2d 315, 320 (6th Cir.1988) (same). Steele accordingly contended that his conviction on Counts II and III of the indictment should be reversed.

■ The United States Supreme Court, in *Kungys v. United States*, 485 U.S. 759, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988), has recently revisited the issue of materiality imposed by federal criminal statutes as it bears upon disclosure of information in response to inquiries from federal agencies, and has attempted to distinguish between materiality as a question of fact for determination of the fact finder or a question of law to be resolved by the court. *Kungys v. United States*, 485 U.S. 759, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988) (examining issue of materiality under reporting requirements of the Department of Immigration and Naturalization). After reviewing the criteria employed by various courts of appeals within the context of a variety of criminal reporting statutes, including this circuit's discussion in *United States v. Abadi*, 706 F.2d 178, 180 (6th Cir.), *cert. denied*, 464 U.S. 821, 104 S.Ct. 86, 78 L.Ed.2d 95 (1983),[5] the Supreme Court concluded that the issue of materiality is generally treated

---

5. In *Abadi*, this court concluded that the question of materiality in criminal statutes generally presents an issue of law to be decided by the court rather than the trier of fact.

   The defendant contends that the issue is a factual question to be submitted to the jury like the other essential elements of the offense.... While this circuit has not passed on this issue in the context of a false statement prosecution under 18 U.S.C. § 1001, we have ruled that materiality in a question of law in a perjury prosecution under 18 U.S.C. § 1621, ... and in a prosecution for false statements to a grand jury under 18 U.S.C. § 1623....

   After careful consideration, we hold that the materiality issue in a section 1001 prosecution should be treated as a question of law.

*Abadi*, 706 F.2d at 180 (citations omitted); *see also United States v. Keefer*, 799 F.2d 1115, 1126 (6th Cir.1986) ("[M]ateriality is a question of law for the court to decide..... 'The materiality of a statement rests upon a factual evidentiary showing, but the ultimate decision is a legal one.' ") (quoting *United States v. Beer*, 518 F.2d 168, 172 (5th Cir.1975)) (other citations omitted); *United States v. Chandler*, 752 F.2d 1148, 1150–51 (6th Cir.1985) ("Materiality under § 1001 is a question of law.... It is not an element of the offense that must be proved beyond a reasonable doubt but a 'judicially-imposed limitation to insure the reasonable application of the statute.' ") (quoting *Abadi*, 706 F.2d at 180 n. 2).

as question of law to be decided by the court.

> [W]e must first consider whether materiality ... is an issue of law, which we may decide for ourselves, or one of fact, which must be decided by the trial court. Here again we see no reason not to follow what has been done with the materiality requirement under other statutes dealing with misrepresentations to public officers. "[T]he materiality of what is falsely sworn, when an element in the crime of perjury, is one for the court." *Sinclair v. United States,* 279 U.S. 263, 298, 49 S.Ct. 268, 273, 73 L.Ed. 692 (1929). As the Sixth Circuit has said in a case involving 18 U.S.C. § 1001,
>
>> [a]lthough the materiality of a statement rests upon a factual evidentiary showing, the ultimate finding of materiality turns on an interpretation of substantive law. Since it is the court's responsibility to interpret the substantive law, we believe [it is proper to treat] the issue of materiality as a legal question.
>
> *Kungys,* 485 U.S. at 772, 108 S.Ct. at 1547 (quoting *Abadi,* 706 F.2d at 180); *compare United States v. Hartness,* 845 F.2d 158, 161 n. 4 (8th Cir.1988) (materiality generally a question of law for the court to determine). Defendant's characterization of this issue as a question of fact for the jury is foreclosed by the Supreme Court's pronouncements in *Kungys,* as well as existing precedent in this circuit.

Additionally, the defendant has challenged the district court's conclusion that the exclusion of some $20,000 of income on his 1981 federal individual income tax return, and some $40,000 of income on the 1981 partnership tax return for Woodland Heights, was material under the circumstances involved in the instant case. Steele argued that even if he had reported this income to the IRS in his individual and partnership tax teturns, his actual tax liability in 1981 would not have been affected and, consequently, the omission of this information could not have been "material" since it had no financial impact upon his tax liability to the IRS for that period. This argument, however, is not well taken.

In *Kungys,* the Supreme Court indicated that the proper test for determining materiality was not whether the omission of particular information would have *actually* affected the decision of a governmental agency, but rather it was "whether the misrepresentation or concealment was *predictably capable of affecting, i.e., had a natural tendency to affect,* the official decision." *Kungys,* 485 U.S. at 771–72, 108 S.Ct. at 1547 (emphasis added); *accord Keefer,* 799 F.2d at 1126 ("The test for materiality is whether 'the false statement "had a *natural tendency* to influence, or *was capable of* influencing, the decision" of the agency.' ") (quoting *Chandler,* 752 F.2d at 1151 (quoting *Weinstock v. United States,* 231 F.2d 699, 701–02 (D.C.Cir. 1956))) (emphasis added). In the case at bar, it is indisputable that the underreporting of taxable income, in the amounts of $20,500 and $40,000, was "predictably capable of affecting," and "had a natural tendency to influence," the IRS's determination of Steele's potential tax liability. The fact that this underreporting did not ultimately alter his actual tax liability is accordingly not relevant, and the assignment of error is without merit.

This court has considered the defendant's remaining assignments of error and has concluded that they are without merit. Accordingly, the judgment of conviction entered against the defendant Steele is hereby AFFIRMED, with the exception of the judgment arising from his conviction on count 4 of the indictment, which is hereby REVERSED and the case is REMANDED with instructions to enter a judgment of acquittal as to that count and for the limited purpose of resentencing the defendant.

RYAN, Circuit Judge, dissenting.

The burden of the court's decision today is that the plain and unambiguous language of 18 U.S.C. § 1001 shall not be applied as written in the case before us because "a truthful response by Steele to the IRS agent's inquiry would have been patently incriminating ..." Thus, the panel aligns this court with a number of circuits

that have subscribed to what has come to be called the "exculpatory no" doctrine exception to § 1001.

Because I am satisfied that the court and the circuits it follows have erred, I must dissent with respect to the reversal of the defendant's conviction of count IV of the indictment.

### I.

The genesis of the idea that § 1001 should not be applied as written in certain cases is a trial court opinion emanating from a United States District Court for the District of Maryland in 1955, *U.S. v. Stark*, 131 F.Supp. 190 (D.Md.1955), in which the court held that certain false negative answers, given under oath to agents of the Federal Bureau of Investigation, were not "statements" within the meaning of § 1001. There issued, thereafter, a line of cases from several courts to the general effect that § 1001 will not be applied to false negative answers to official inquiries when the speaker elects to make the untruthful response because a truthful answer would be "incriminating." The earliest court of appeals cases refusing to apply § 1001 as written followed the *Stark* reasoning that a negative answer of the kind described was simply not a "statement" within the meaning of § 1001. *Paternostro v. United States*, 311 F.2d 298, 305 (5th Cir.1962), *United States v. Bedore*, 455 F.2d 1109, 1111 (9th Cir.1972).

Understandably, that reasoning attracted little support. Later decisions from courts refusing to apply the statute as written augmented their citation to *Stark* with the further rationale that when a truthful statement to an official inquiry would be incriminating, a false negative statement should be insulated from the application of § 1001 by the judicial invention of an "exception" for such negative falsehoods.

Over the years, judicial refusal to obey the command of § 1001 in such circumstances was first given the name an "exculpatory no" statement, then labeled an "exception" to the statute, and, finally, elevated to the stature of a "doctrine." And thus, it is that in a span of a few years a federal trial court's refusal to apply a criminal statute as written, manifestly because it struck the court as unfair to do so, became a judge-made "exception" to an Act of Congress and, for a touch of judicial legitimacy, was labeled a "doctrine."

Now this court has taken the matter a step further by refusing to apply the statute, not to a merely negative reply to an official inquiry, but to the affirmative act of knowingly submitting false written documents to the government, describing a real estate transaction to be what it is not. A slippery slope, this business of writing judge-made exceptions into an Act of Congress.

### II.

Section 1001 is written in direct, simple, and unambiguous language. It says:

> Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

Assigning to the words used in the statute their primary and generally accepted meaning, it is indisputable that they make criminal defendant Steele's act of knowingly submitting documents to IRS Agent Hall which falsely described details of the real estate transaction with James Duerr.

The syllogism goes like this:

Major: All false, fictitious, or fraudulent representations, knowingly made, to an *agency of the government, regarding* a matter within its jurisdiction is a crime.

Minor: But Steel knowingly made a false and fictitious representation to a government agency regarding a matter within its jurisdiction.

Conclusion: Therefore, Steel's representation, knowingly made, is a crime.

But my brothers say the statute should not be applied to Steele because to do so would be unfair; unfair because the only way Steele could avoid violating the statute was to incriminate himself. Therefore, the court reasons, it is necessary that the judicially conceived "exculpatory no" exception be read into the statute in order to make it inapplicable to situations such as the one at hand, to which, by the statute's unambiguous terms, it is plainly applicable. Stated differently, if Steele chose to violate the statute in order to avoid incriminating himself, his violation should be excused because his purpose is valid. Thus, is the end made to justify the means. And if Congress, having written a statute which contains no exception for Steele's situation, did not see fit to excuse Steele, this court will excuse him by simply declaring that from this day forward there is, in this circuit, an exception to the statute for people in Steele's circumstances.

Regrettably, the court's opinion is mistaken both as a matter of *fact* and as a matter of *law*.

It is mistaken as a matter of *fact* because it is simply not true that the only alternative available to Steele, if he wished to avoid violating § 1001, was to submit valid documents to the IRS and thus incriminate himself. In fact, he had another very familiar and constitutionally protected alternative. He could have refused to provide the IRS with the documents they requested concerning the real estate transaction, and, if lawfully ordered to do so, he might simply have responded that he declined to provide the documents or to answer any questions, invoking his constitutional right against self-incrimination. Had he done either of those things, he would not have violated the statute and he would not have incriminated himself. It is difficult to understand why the court concludes today that Steele's only alternative to violating the statute was self-incrimination when, plainly, it was not.

And the court is also mistaken as a matter of *law*.

No matter how many circuits have concluded that § 1001 would be fairer if it contained an exception for circumstances of the kind faced by Steele, the fact is that the statute does not contain such an exception. Congress, cognizant of the argument that some people think it was unfair of Congress to make it a crime to provide the government with false information when supplying truthful information would be incriminating, has declined to write an "exculpatory no" exception into § 1001. Whether the statute would be wiser or fairer were such an exception part of it is quite beside the point. Courts simply have no authority to create one. While there is no question that courts have the authority to create exceptions to judge-made law, there is likewise no question that they have no authority to do so with respect to congressional enactments.

As Judge William Wilkins put it in his dissenting opinion in *United States v. Cogdell*, 844 F.2d 179, 187 (4th Cir.1988):

> While there is an appealing argument that for policy reasons Congress should amend section 1001 by incorporating the exculpatory no doctrine, this is a responsibility of Congress, not the courts.

In a word, the utter absence of lawful authority in a federal court, trial or appellate, to rewrite a congressional enactment by creating an exception which cannot, by any stretch of the imagination, be found in the language of the statute, explicitly or implicitly, is too self-evident to warrant citation of authority.

All judges and lawyers are familiar with judicial decisions in which courts interpret or construe ambiguous or otherwise unclear statutes in ways that exclude their application in certain situations arguably within the letter of the statute, but thought by the court not to be within the intent of the lawmaker. But here there is not so much as lip service to that sort of reasoning. With admirable forthrightness, the court today does not suggest that it is interpreting or construing § 1001 or that it is ambiguous in any way. Rather, relying almost entirely upon statements by other circuits in cases involving distinctly differ-

ent facts, it opts to subscribe to the legally unsupportable argument that a simple, plain, direct, and unambiguous criminal statute can be made to mean what it does not say simply by adoption of a judicially invented "exception."

The only hint of legal reasoning of any sort offered as justification for what the court has done today is the following:

> The "exculpatory no" doctrine, which appears to be receiving widespread acceptance by federal courts of appeals, is anchored, *inter alia,* upon the fifth amendment's protection against self-incrimination through the use of compelled statements.

P. 1001 (citations omitted).

Despite that statement, it is noteworthy that the court does not hold that the statute is unconstitutional or in any fashion impinges upon the defendant's fifth amendment privilege against self-incrimination, facially or as applied. Rather, the new "doctrine" is merely "anchored" upon the fifth amendment. In addition, the court does not hold or suggest, implicitly or otherwise, that the false documents submitted to Agent Hall by Steele were "compelled" statements. Rather, the "fifth amendment ... self-incrimination" language in the court's opinion, and in the opinions it cites from sister circuits, is used as a sort of judicial talisman, giving the ring of constitutional legitimacy to what actually is a simple judicial refusal to apply a statute the court deems unfair.

Respectfully, the legal and logical invalidity of the rule the court has adopted today cannot be justified either by the desirability of the end achieved, the court's power, as distinguished from its authority, to do what it has done, or the number of other circuits in which today's reasoning is "receiving widespread acceptance."

For the foregoing reasons, and because I concur in the court's disposition of the remaining issues, I would affirm the judgment entered below.