972 F.2d 344
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Connie Whitley WILKES, Defendant-Appellant.
 No. 92-5037.
 United States Court of Appeals,
Fourth Circuit.
 Argued: June 18, 1992
Decided: August 7, 1992
 
 ARGUED: Farris Allen Duncan, Goldsboro, North Carolina, for Appellant.
 Robert Edward Skiver, Assistant United States Attorney, Raleigh, North Carolina, for Appellee. ON BRIEF: Margaret Person Currin, United States Attorney, Raleigh, North Carolina, for Appellee.
 Before RUSSELL, WIDENER, and HALL, Circuit Judges.
 PER CURIAM:
 
 OPINION
 
 1
 Connie Wilkes appeals her conviction of misprision of felony. She attacks the sufficiency of the evidence to sustain the conviction. Finding no merit in this challenge, we affirm.
 
 I.
 
 2
 Chad and Joseph Jones, who are brothers, were at the center of a cocaine smuggling and distribution ring in eastern North Carolina from late 1989 until July, 1990. A third brother, who was serving in the military in Panama, shipped cocaine in stereo equipment to North Carolina. When Chad and Joseph received the cocaine, they stored it in a shed behind the home of Jimmy Arrington. The final step of the operation was delivery of the cocaine to "Jaguar," from New York, who would come to North Carolina to pick it up. These pick-ups were arranged through phone calls from Chad Jones to"Jaguar."
 
 
 3
 Jimmy Arrington was arrested on July 2, 1990; Chad Jones witnessed the arrest. The Jones brothers went on the lam. Appellant Connie Wilkes, their "second mother," allowed them to stay at her home from at least July 4 to July 9, 1990.
 
 
 4
 Chad Jones called and received calls from "Jaguar" several times during his stay at Wilkes' house. "Jaguar" had $7,500 wired to the Jones' sister Anita to get a bail bond for Arrington. Wilkes took the money and went to bail Arrington out; however, Arrington's bail was $50,000 cash, and Wilkes was unsuccessful.
 
 
 5
 On Saturday, July 7, during a card game at Wilkes' house, the conspirators discussed disposing of 28 kilograms of cocaine that the authorities had not discovered. Wilkes was present during the conversation, as were her 17-year-old son Anjewal Whitley, her boyfriend Clyde Ballard, and another conspirator, Julian Daniels.
 
 
 6
 The next day, Joseph Jones, Anjewal Whitley, and Julian Daniels went to Arrington's shed and retrieved the 28 kilograms. They moved the cocaine to a junk car in the neighborhood. Chad Jones called "Jaguar," who told him to take the cocaine to a local Day's Inn and give it to "Joey."
 
 
 7
 Chad asked Wilkes for a ride to the Day's Inn. She agreed to do so after she returned from going out with Ballard. At midnight, after having had a few drinks, Wilkes and Ballard returned to her home. The Jones brothers, Daniels, and Wilkes' son joined the couple in Wilkes' car, which Ballard drove, and the six set off.
 
 
 8
 They went to the abandoned car, where Daniels and Joseph Jones retrieved the cocaine. They put it into Wilkes' suitcase, which her son had taken from her house. The suitcase was placed in the trunk of the car, and they proceeded to the Day's Inn in Kenly, North Carolina. Conversation about the cocaine abounded. Wilkes asked if she could keep one kilogram, but her son opposed the idea, because "the guy at the hotel" knew how many kilograms there should be. The cocaine was delivered by the Jones brothers and Daniels to two men at the hotel, and the group returned to Wilkes' home. At 1:20 a.m., someone telephoned "Jaguar" in New York. Chad Jones gave Anjewal Whitley $100 to reimburse his mother for her suitcase.
 
 
 9
 DEA and Postal Service agents had intercepted two packages of cocaine in the mail shortly after Arrington's arrest, and had been looking for Chad and Joseph Jones ever since. The pair finally surrendered to authorities on July 11.
 
 
 10
 Wilkes was arrested on March 13, 1991. After receiving Miranda warnings, she told a postal inspector that the Jones brothers had stayed at her house "when they were doing things." She admitted that Chad Jones had asked her to take them to the Day's Inn, but denied that she had done so.
 
 
 11
 On July 16, 1991, Wilkes and Clyde Ballard were indicted for aiding and abetting distribution of 28 kilograms of cocaine and for misprision of felony. Ballard pled guilty to the misprision count, and the aiding and abetting count was dropped. Wilkes pled not guilty.
 
 
 12
 A jury trial was held on October 16-17, 1991. At the close of the government's case, the district court entered a judgment of acquittal on the aiding and abetting count. However, the misprision of felony count went to the jury, and Wilkes was convicted.
 
 
 13
 Wilkes appeals.
 
 II.
 
 14
 To establish the crime of misprision of felony, the government must prove: (i) a felony was committed; (ii) the defendant knew that the felony had been committed; (iii) the defendant failed to notify authorities; and (iv) the defendant took an affirmative step to conceal the crime. 18 U.S.C. § 4; Neal v. United States, 102 F.2d 643, 646 (8th Cir. 1939); United States v. Baez, 732 F.2d 780, 782 (10th Cir. 1984); United States v. Ciambrone, 750 F.2d 1416, 1417 (9th Cir. 1984); United States v. Stuard, 566 F.2d 1, 2 (6th Cir. 1977). On review of the jury's verdict of guilt, this court must affirm if any rational trier of fact could have found the elements of the crime proved beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307 (1979).
 
 
 15
 In this case, the dispute centers on the last element of misprision-did the government prove that the defendant took an affirmative step to conceal the crime? Appellant concedes that the evidence establishes that a felony was committed, she knew of it, and she failed to notify authorities.
 
 
 16
 The government identifies an array of acts from which the jury could have found "concealment." Wilkes harbored the Jones brothers knowing that they were hiding from authorities. She attempted to bail out Arrington, thus shielding the conspirators from dealing in person with authorities. She was present, in her own automobile while evidence-the cocaine-was disposed of in her own suitcase. She allowed her telephone to be used to call "Jaguar" in connection with the disposal of the cocaine. Finally, her statement to the postal inspector after her arrest misrepresented some facts and omitted others.
 
 
 17
 Wilkes concentrates her arguments on this final strand of evidence-her post-arrest statement. She employs a good tactic, because this "concealment" is the most problematic. There are substantial constitutional problems with branding her failure to volunteer incriminating information under custodial interrogation as "concealment." She certainly has a right to say nothing at all, and the circuits that have addressed the question are uniform that a misprision conviction based on nothing more than invocation of that right is invalid. United States v. Jennings, 603 F.2d 650 (7th Cir. 1979); United States v. King, 402 F.2d 694 (9th Cir. 1968). Other cases have reached an analogous result in holding that pre-arrest silence may satisfy the "failure to disclose" element of misprision, but that silence alone is not "concealment." Lancey v. United States, 356 F.2d 407 (9th Cir.), cert. denied, 385 U.S. 922 (1966); Bratton v. United States, 73 F.2d 795, 797-798 (10th Cir. 1934); see United States v. Warters, 885 F.2d 1266, 1275 (5th Cir. 1989) (sua sponte raising for consideration on remand adequacy of indictment charging failure to disclose but no additional act of concealment, citing Bratton for proposition that silence is not concealment).
 
 
 18
 To the extent that Wilkes did not remain silent, but instead lied to the inspector (i.e. she did not take the conspirators to the Day's Inn), a circuit precedent is almost on point. In United States v. Pittman, 527 F.2d 444 (4th Cir. 1975), cert. denied, 424 U.S. 923 (1976), the defendant, after receiving Miranda warnings, gave an untruthful statement that concealed her husband's involvement in a bank robbery. This court affirmed her misprision conviction.[1] However, Wilkes distinguishes Pittman because she claims that her prevarications concealed her own crime, and not the felony of others, and she should be protected by the so-called "exculpatory no" doctrine, which protects a person from false statement prosecution under 18 U.S.C. § 1001 where he denies guilt to a federal investigator. United States v. Cogdell, 844 F.2d 179 (4th Cir. 1988).
 
 
 19
 Because of the strength of the evidence of guilt, we will not address these self-incrimination subtleties. Wilkes rightly attacks this part of the government's proof because it provides her good arguments. If the statement to the postal inspector were the government's whole case, this appeal would be close and difficult. There is much more, though.
 
 
 20
 Harboring a fugitive and assisting in the disposal of evidence are each sufficient factual bases for a misprision of felony conviction.[2] A reasonable jury could easily have found that Wilkes did both. Any error in admitting Wilkes' comments to the postal inspector is therefore harmless.
 
 
 21
 The conviction is affirmed.
 
 AFFIRMED
 
 
 [1]
 We declined to decide, however,"whether she could have been prosecuted successfully had she exercised her right not to incriminate herself." 527 F.2d at 445
 
 
 [2]
 E.g., Lancey, 356 F.2d at 410-411 (harboring fugitive or hiding evidence can constitute "concealment"); Bratton, 73 F.2d at 797-798 (10th Cir. 1934) (dicta) (suppression of evidence or harboring criminal would be concealment); United States v. Gravitt, 590 F.2d 123 (5th Cir. 1979) (transporting robbers to retrieve loot is sufficient proof of concealment)